**UNITED STATES of America,**
**Plaintiff,**

v.

**Vincent L. CROCKETT, Defendant.**

**No. 07–20477.**

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 14, 2008.

Michael Bullotta, U.S. Attorney's Office, Detroit, MI, for Plaintiff.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART GOVERNMENT'S MOTION IN LIMINE AND GRANTING IN PART AND DENYING WITHOUT PREJUDICE IN PART DEFENDANT'S MOTION IN LIMINE

DAVID M. LAWSON, District Judge.

Defendant Vincent Crockett is a former Detroit police officer charged in this case with several counts arising out of the apparent theft of cocaine from the department's evidence room. On May 30, 2008, the government filed a motion to exclude evidence of wrongdoing committed by the firearms unit of the Detroit police crime laboratory, evidence of cocaine theft committed by other narcotics officers, and character witness testimony regarding the absence of misconduct by the defendant and on the ultimate issue of guilt or innocence. The defendant also filed a motion *in limine:* to exclude the laboratory test results that indicated the substance initially lodged in the property room was cocaine, because the chemist who conducted the test is now deceased. The Court held a hearing on the motions on June 25, 2008 and ordered the parties to file supplemental briefs. Those filings have been re-

ceived. The Assistant United States Attorney also stated an intention to seek a second superseding indictment adding more charges, which may have an impact on the pending motions. However, that has not been forthcoming, and the motions are ready for decision. The Court finds that evidence of irregularities in the firearms unit of the Detroit police crime laboratory ought not to be admitted, evidence suggesting alternate suspects is relevant, and the defendant's proposed character evidence is admissible, provided it is in the proper form. In addition, evidence consisting of the laboratory printouts from the gas chromatography and mass spectrometry will be admissible if the government can establish a proper foundation at trial. Although the prospect of the government being able to establish such a foundation without a Confrontation Clause violation is far from assured, the Court cannot rule out that possibility at this time. Therefore, the Court will grant in part and deny in part the government's motion *in limine* and grant part of the defendant's motion *in limine* and deny the balance without prejudice.

## I.

According to the indictment, it appears that the government's theory of the case is that defendant Vincent Crockett removed a large quantity of cocaine from the Detroit Police Department property room and several weeks later returned a non-controlled substance in its place. In July 2005, officers from the Detroit Police Department seized from Lindell Brown a substance weighing over six kilograms and logged the evidence into the property room, placing it in a bag with identification number NO 1906205. The substance was conveyed by Officer Rydell Smith to the Detroit Police Department forensics laboratory on June 13, 2005. Laboratory tests were performed by chemist Michael Williams, who determined that the sub-

stance was cocaine. After testing was completed, Mr. Smith picked up the bag and returned it to the evidence room.

The government alleges that the defendant signed out the substance in item NO 1906205 on March 27, 2007, and he returned the bag on July 13, 2007. Thereafter, the substance was retested by Mr. Williams, who determined that the substance was not cocaine but rather a different compound.

George Chirackal, another forensic chemist with the Detroit Police Department, reviewed Mr. Williams's initial report pursuant to department policy, although he did no testing himself, nor did he witness Williams perform his work. According to an FBI interview, Mr. Chirackal

merely reviewed the findings of Williams and had not conducted an analysis on his own. Chirackal reviewed the analysis report and confirmed lab numbers were consistent on each laboratory analysis document related to Lock Seal# N01906205. Chirackal reviewed the lab charts, and weights that confirmed the sample was cocaine. Chirackal advised that the report showed that Williams had conducted three presumptive tests: the Cobalt Thiocyanate test, Travinkoff's Reagents test and the Micro Crystal test. All three test [sic] indicated positive for the presence of cocaine. Chirackal advised that the analysis report showed Williams then conducted two confirmatory tests which included the Gas Chromography—Mass Spectrometer test and the Infrared Spectrometer test. Again the analysis report confirmed the tested sample was cocaine. Chirackal stated it is policy that after a sample is analyzed the source of where the sample was drawn from is secured in the lab's vault.

After reviewing the analysis' report of Lock Seal# N01906205, Chirackal agreed with Williams' analysis report and advised that nothing unusual stood out or was out of the ordinary when reviewing the analysis report.

Def.'s Resp. to Gov't's Request, Ex. A.

Mr. Chirackal did not participate in the retesting of the substance. Instead, senior forensic chemist Gayle O'Neal reviewed Mr. Williams's second test protocols. Notes from a June 2, 2008 FBI interview discuss the response taken after the substance was returned:

> O'NEAL learned that there were concerns that the drugs had been tampered with and that a re-analysis of the evidence had been ordered.
>
> MICHAEL WILLIAMS, who had performed the initial testing of the evidence, Lab Number N05–2253, was assigned to complete the re-analysis.... O'NEAL conducted the peer review on WILLIAMS' re-analysis. WILLIAMS concluded, and O'NEAL concurred, that CROCKETT had returned an inert substance to the property room. O'NEAL performed the peer review on another lock seal folder that CROCKETT had handled. O'NEAL concurred with WILLIAMS' findings that the drugs had been reduced slightly in weight and had changed in appearance. O'NEAL concluded that the drugs had been "stepped on" or diluted.

O'NEAL described WILLIAMS as a very thorough and very competent chemist. Def.'s Resp. to Gov't's Request, Ex. C.

The defendant points out that there apparently are three other questionable incidents involving missing cocaine from the Detroit Police Department property room. The first incident involves evidence bag NO396185. In December 2006, Rydall Smith delivered this bag to the Detroit Police Department forensic lab, where the substance was tested by Christopher Kiyak, who concluded that it was cocaine. At the time, it weighed 375.42 grams. On July 13, 2007, Mr. Crockett returned the bag to the property room (presumably having checked it out at an earlier time, which is not reported in the record). On July 18, 2007, the bag was conveyed from the property room to the forensic lab by Mr. Smith. The substance was retested by Mr. Kiyak, and found to weigh 373.26 grams.

In another incident, Mr. Smith delivered evidence bag NO2840805 containing three substances to the Detroit Police Department forensic laboratory, where it was tested by Mr. Williams. Mr. Williams found that each of the substances was cocaine, and the substances weighed 1014.73 grams, 623.19 grams, and 4.32 grams, respectively. The defendant checked out this evidence on March 22, 2007 and returned it on July 13, 2007. Mr. Smith reconveyed the bag to the forensic laboratory on July 17, 2007, where Mr. Williams found that the substances only weighed 980.50, 612.70, and 3.80 grams, and they were diluted.

The third incident involves evidence bag NO2840905. On January 12, 2007, Mr. Smith delivered the bag containing seven substances to the DPD forensic lab. Mr. Williams tested the substances and discovered that substances "A," "B–1," "B–2," and "C" were cocaine, and weighed 40 grams, 2.64 grams, 3.44 grams, and 62.06 grams, respectively. Substances "D–1" and "D–2" did not contain any cocaine, and substance "E" contained an insufficient amount to run an analysis. Mr. Crockett removed the evidence bag and returned it on July 13, 2007. On July 17, 2007, Mr. Smith took the evidence bag to the forensic lab, where Mr. Williams retested and reweighed the contents. Substance "A," "B–1," "B–2," and "C" were still cocaine, but now weighed 34.74 grams, 2.60 grams,

3.33 grams, and 60.73 grams, respectively. Substances "D–1" and "D–2" still contained no controlled substance, and substance "E" did not contain an amount sufficient to analyze.

The government reports that Mr. Williams passed away recently, and there is nothing in the record to suggest that Mr. Crockett was involved in his demise.

It appears that the Detroit Police Department crime laboratory has been plagued with difficulty in the form of inaccurate test results and misconduct by some of its employees. At the time the present motions were filed, most of that misconduct was attributed to the laboratory's firearms unit. The defendant intends to introduce evidence of that misconduct, evidence of other police officers stealing cocaine, and character witnesses in his favor. To overcome the difficulty of its deceased expert witness, Michael Williams, the government seeks to introduce the testimony of Chirackal, Hartzell, and O'Neal, who were involved in some manner with reviewing William's reports of testing the cocaine. Each side has filed motions *in limine* directed at the other side's evidence.

## II.

The government seeks to exclude three types of evidence: evidence of bad acts by other officers, evidence of specific good conduct by the defendant, and any witness's opinion as to the guilt or innocence of the defendant.

## A.

The government's concern over evidence of other officers' misconduct falls into three categories: allegations appearing in recent media reports of inaccuracies involving the firearms unit of the Detroit Police Department's crime laboratory; the facts and circumstances involved in another prosecution in this District involving

Detroit Police Officers accused of stealing drugs from the property room; and any other allegation of misconduct involving Detroit Police Officers, including narcotics officers. The government contends that this evidence is irrelevant to the charges in the indictment, but if relevant it is only marginally so, and the relevance is substantially outweighed by the danger of unfair prejudice to the government. The defendant disputes each of these points.

Although "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant, Fed R. Evid. 401, such "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Fed R. Evid. 403. "Probative value and need for the evidence are separate considerations that weigh in favor of admission under the Rule 403 balancing test." *See* Fed.R.Evid. 403 advisory committee's note (stating that the rule involves 'balancing the probative value of *and* need for the evidence against the harm likely to result from its admission') (emphasis added). *United States v. Stout,* 509 F.3d 796, 800 (6th Cir.2007). The concept of "unfair prejudice" is comprised of two distinct notions:

First, when the evidence may tend to prove more than one proposition and thus could be considered for both a proper and an improper purpose, unfair prejudice can result when the improper purpose overwhelms or substantially overshadows any legitimate basis for receiving the evidence. *See United States v. Vandetti,* 623 F.2d 1144, 1149 (6th Cir.1980) (quoting Advisory Comm.

Note to R. 403, stating, " 'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"). Second, unfair prejudice can result when evidence that is only marginally probative tends to be given preemptive weight by the jury substantially out of proportion to its logical force. *See Sutkiewicz v. Monroe Cnty. Sheriff,* 110 F.3d 352, 360 (6th Cir.1997) (stating that "[o]therwise relevant evidence may permissibly be excluded if it serves to inflame the passions of the jury"); *Vandetti,* 623 F.2d at 1149 (observing that evidence of a witness's invocation of his Fifth Amendment right before the jury raised "a real danger that ... [it] may be given undue weight" to the evidence "although it is entitled to none in the law").

*Dresser v. Cradle of Hope Adoption Center, Inc.,* 421 F.Supp.2d 1024, 1030 (E.D.Mich.2006); *see also Old Chief v. United States,* 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (quoting Advisory Committee's Notes on Fed.R.Evid. 403). As the defendant pointed out, the Sixth Circuit has suggested that "[t]he prejudice envisioned by Rule[ ] 403 ... is prejudice to a criminal defendant," and the Court should be aware that the overriding concern of the Sixth Circuit's development of factors to guide the 403 inquiry is to "ensure[ ] that the *defendant* will receive a fair trial." *United States v. Smith,* 736 F.2d 1103, 1107 (6th Cir.1984) (emphasis in original). However, other considerations allow the Court to limit the defendant's evidence, such as confusion of the issue or waste of time. *See United States v. Blackwell,* 459 F.3d 739, 753 (6th Cir.2006).

The defendant argues that evidence of inaccuracies reported in the firearms unit is relevant because it tends to show that the Detroit Police crime laboratory has failed to exercise appropriate oversight and supervision over property and laboratory testing, which in turn may support an inference that someone other than Mr. Crockett could have taken the cocaine. Although the firearm unit is a different unit, the defendant points out that it is part of the same crime laboratory.

In a supplemental brief, the government furnished the organizational structure of the forensics laboratory, which confirmed that Michael Williams and other forensic chemists report to Gayle O'Neal. The other forensic units at the crime laboratory appear to have different forensic personnel who report to their own respective supervisors. None of the personnel in the units, including direct supervisors, overlap. However, Ms. O'Neal and the supervisor of the firearms laboratory fall under the ultimate authority of Paula Lytle, the Third Deputy Chief of Police. They also appear to report to Sergeant Paul Hartzell and Lieutenant Bilal Muhammad in Administration.

■ The link between workers in the drug laboratory and the firearms unit is quite tenuous. Different individuals work in each laboratory, and each laboratory has a distinct supervisor. The only way that evidence of wrongdoing in one division can be imputed to the other is through the laboratory supervisors' common supervisor. The inference the defendant appears to rely upon is that wrongdoing in the firearms unit demonstrates a willingness to tolerate sloppiness by the administration, which then implies there is carelessness or even misconduct in the chemistry laboratory. During oral argument, defense counsel described this link as "incompetence, lack of accountability, lack of oversight." Even if "lack of accountability" is established in the firearms unit, however, the defendant must rely on an inference that Ms. O'Neal, the drug laboratory supervisor, then permitted "incompetence" in her unit, which somehow

translates into a breakdown of security measures relating to the storage of controlled substances. The relevance of this evidence is only marginal at best, and the danger that the jury would be confused by a presentation of this tangential proof substantially outweighs any proper purpose for which the evidence might be offered. Therefore, the Court will grant the government's motion as to evidence of irregularities in the firearms unit of the crime laboratory.

■■■ Proof that other officers may have taken the cocaine from the property room or at other waypoints as the evidence traveled along the chain of custody, however, certainly is relevant. In fact, it appears to be the heart of the defense. Evidence from which a jury could infer that other officers stole the cocaine—including evidence that others had access to it, had stolen cocaine in the past, or had committed irregularities in handling drug evidence—is relevant, and its relevance is not outweighed by the danger of jury confusion or unfair prejudice.

### B.

In seeking to exclude evidence of past honest behavior by the defendant, the government acknowledges that evidence of a pertinent character trait of the accused offered to show that he likely did not commit the crime is expressly allowed by Federal Rule of Evidence 404(a)(1). The government points out, however, that the defendant is limited in its method of proving such a character trait. The government is correct. Character evidence may be introduced for this purpose only "by testimony as to reputation or by testimony in the form of an opinion." Fed R. Evid. 405(a). "On cross-examination, inquiry is allowable into relevant specific instances of conduct." *Ibid.*

■■ The defendant will not be permitted to prove a pertinent character trait by offering evidence of specific instances of good conduct. However, to support the character witness's opinion or testimony of the defendant's reputation, the witness may testify that the defendant is a good person and the witness was unaware of the defendant committing any illegal activities. *See United States v. Matthews,* 440 F.3d 818, 825 (6th Cir.2006); *United States v. Green,* 305 F.3d 422, 431 (6th Cir.2002).

### C.

■■ Finally, the government contends that the defendant's witnesses should not be permitted to offer their opinion that the defendant is innocent of the charged crimes. Testimony by character witnesses as to whether they believe Mr. Crockett is the type of person who would take drugs from the police evidence room is proper character testimony. However, the opinion of such witnesses as to whether the defendant is actually guilty or innocent does not advance the inquiry at all. Such evidence does not meet the very low threshold for relevance established by Federal Rule of Evidence 401.

### III.

The defendant objects to certain evidence of drug test results, first addressing any government attempt to introduce the testimony of police officer John Dembinski, who performed a field test known as a "presumptive test" or "Travnikoff test" performed on the cocaine. Officer Dembinski presumably would testify as to his opinion that the substance field-tested contained cocaine, but the defendant contends testimony about the "Travnikoff test" would be expert testimony that is not reliable and will fail to satisfy Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). However, the government stated at the motion

argument that it has no intention to rely upon the Travnikoff test and will make no argument as to its admissibility. Therefore, the Court will grant the defendant's motion *in limine* as to that evidence.

The more interesting argument by the defendant is that surrogates should not be able to give evidence of the results of Michael Williams's testing. The government notes that in *United States v. Moon*, 512 F.3d 359 (7th Cir.2008), the Seventh Circuit approved testimony that is very similar to that proposed here. An expert witness who did not perform the drug analysis testified that the substance was cocaine based on a former chemist's gas chromatograph and infrared spectrometer data. Similarly, in *United States v. Washington*, 498 F.3d 225 (4th Cir.2007), the court approved the admission of expert testimony from a toxicologist who relied on the defendant's toxicology tests results, finding that the data generated by the laboratory's diagnostic machines were not testimonial statements. The defendant argues that laboratory data is testimonial under the Sixth Circuit's broad definition in *United States v. Cromer*, 389 F.3d 662, 674 (6th Cir.2004). He suggests that *Moon* and *Washington* were wrongly decided and conflict with the Supreme Court's instruction in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and notes that the Supreme Court has granted certiorari in a case raising a related issue. *See Melendez–Diaz v. Massachusetts*, —— U.S. ——, 128 S.Ct. 1647, 170 L.Ed.2d 352 (2008) (argued November 10, 2008).

■ Apparently, in this case the government proposes to have another expert witness testify after examining the printouts from the laboratory instruments Mr. Williams used to test certain drug samples and interpret those readings for the jury. That course of action raises potential issues implicating the rule against hearsay and the Confrontation Clause. One aspect of the matter is whether there is a bar to the use of the printouts themselves. Other courts have had no trouble concluding that readings from laboratory instruments implicate neither the hearsay rule nor the Confrontation Clause. *See Washington*, 498 F.3d at 231; *Moon*, 512 F.3d at 362; *United States v. Richardson*, 537 F.3d 951, 959–960 (8th Cir.2008). This Court agrees. The instrument readouts and printouts are not "statements" within the meaning of the Federal Rule of Evidence 801(a), which defines the term to mean "an oral or written assertion or ... nonverbal conduct *of a person.*" Fed.R.Evid. 801(a) (emphasis added). Laboratory instruments and machines are not "persons," and their readouts and indications are not "statements." *See United States v. Hamilton*, 413 F.3d 1138, 1142–43 (10th Cir. 2005) (concluding that the computer-generated header information accompanying pornographic images retrieved from the Internet was not a hearsay statement because there was no "person" acting as a declarant); *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir.2003) (concluding that an automatically generated time stamp on a fax was not a hearsay statement because it was not uttered by a person). Consequently, admitting the laboratory test results of Mr. Williams's mass spectrometer and gas chromatograph would not violate the hearsay rule (by definition) or the Confrontation Clause (by implication). *See Washington*, 498 F.3d at 231 (holding that "the raw data generated by the machines do not constitute 'statements,' and the machines are not 'declarants.' As such, no out-of-court statement implicating the Confrontation Clause was admitted into evidence through the testimony of Dr. Levine").

■ For a similar reason, allowing a qualified witness to interpret those read-

outs for the jury would not run afoul of either the rule against hearsay or the Confrontation Clause because the witness would be in court giving testimony and subject to cross-examination. *See United States v. Goosby,* 523 F.3d 632, 638 (6th Cir.2008) ("There is also no Confrontation Clause violation because Gibeault did not make statements that would be characterized as testimonial hearsay."); *United States v. Hunt,* 521 F.3d 636, 644 (6th Cir.2008) ("[T]he purpose of the Confrontation Clause is to guarantee defendants an opportunity to cross-examine and attack the credibility of witnesses and hearsay declarants.").

That is not the end of the matter, however. In order for the laboratory printouts to be received in evidence, they would have to be authenticated. The government would have to establish that they are "what its proponent claims." Fed.R.Evid. 901(a). Two more potential issues arise from that requirement: whether the laboratory equipment produced scientifically sound results; and whether the substance tested actually was the substance that the defendant later checked out of the property room.

■ Addressing the first issue, Federal Practice and Procedure neatly lays out the distinction between authentication rules and expert witness rules:

> Whether Rule 901 or Rule 702 governs the admissibility analysis is a function of the type of reliability problem posed by the evidence. Rule 901 normally controls where there is no question as to the general reliability of the technology employed by the machine and the only question is whether the machine is in good working order. Rule 702 applies where the question is not whether the machine is in good working order but, rather, whether the technology employed by the machine is valid and the data produced by the machine is reliable

evidence of the fact it is offered to prove.

31 Wright & Gold, Fed. Prac. & Proc. § 7103. There is no challenge to the technology here. Gas chromatography and infrared spectrometry have long been recognized as valid technological methods for determining the composition of physical substances. *See United States v. Distler,* 671 F.2d 954, 962 (6th Cir.1981) (applying pre-*Daubert* standard to find that gas chromatography was admissible); *United States v. Metzger,* 778 F.2d 1195, 1203–04 (6th Cir.1985) (holding that use of thin-layer chromatography to determine presence of a chemical satisfied Rule 702 and noting that "Defendant does not dispute that thin-layer chromatography is an accepted scientific technique"); *see also Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 610 n. 3, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (opining that "gas chromatography/mass spectrometry ... if properly conducted, identify the presence of alcohol and drugs in the biological samples tested with great accuracy"); *United States v. Law,* 528 F.3d 888, 913 (D.C.Cir.2008); *United States v. Vitek Supply Corp.,* 144 F.3d 476, 485–86 (7th Cir.1998).

How the government will prove that Mr. Williams actually tested the substance that was lodged in the property room is not readily apparent, however. This issue was not discussed in the cases dealing with admission of laboratory test results through an expert who did not do the testing. *See, e.g., Washington,* 498 F.3d at 230 ("The value of cross-examination might relate to authentication or to a description of the machine or to the chain of custody, but none of these were issues at trial, nor are they issues on appeal.") The government's new expert might rely on the laboratory report prepared by Mr. Williams, but that reliance raises hearsay and Confrontation Clause concerns. In 2004, the

Supreme Court held that the Confrontation Clause prohibited the admission of out-of-court testimonial statements absent "unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Two years later, the Court clarified the definition of "testimonial" statements in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), stating:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822, 126 S.Ct. 2266.

 Applying these guidelines, the great majority of legal commentators subscribe to the view that laboratory reports ought to be deemed testimonial. *See, e.g.*, Edward J. Imwinkelried, *"This is Like Deja Vu All Over Again": The Third, Constitutional Attack on the Admissibility of Police Laboratory Reports in Criminal Cases*, 38 N.M. L.Rev. (forthcoming 2008) ("Imwinkelried"), available at http://www.ssrn.com/abstract=1080059; Pamela R. Metzger, *Cheating the Constitution*, 59 Vand. L.Rev. 475, 504–05 (2006) ("Metzger"); Jennifer Mnookin, *Expert Evidence and the Confrontation Clause after Crawford v. Washington*, 15 J.L. & Pol'y 791, 797–801 (2007) ("Mnookin"); *Recent Case, United States v. Feliz*, 467 F.3d 227 (2d Cir.2006), 120 Harv. L.Rev. 1707 (2007); *see also* 1 Paul C. Giannelli & Edward J. Imwinkelried, *Scientific Evidence* § 6.04(c) n. 233 (4th ed. 2007) ("Giannelli

& Imwinkelried") (collecting cases for the proposition that "lab reports are testimonial in nature"); David Kaye, David Bernstein & Jennifer Mnookin, The New Wigmore § 3.10 (2007 Supp.). This Court agrees. Those reports are prepared with the primary intent of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822, 126 S.Ct. 2266. That was plainly the case with the evidence seized from Lindell Brown.

 Of course, under Federal Rule of Evidence 703, an expert may rely on information "perceived by or made known to the expert at or before the hearing," and "the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Fed.R.Evid. 703. However, the rules of evidence must succumb to the defendant's Sixth Amendment rights, including the right to confront witnesses, when there is a conflict. *Crawford*, 541 U.S. at 61, 124 S.Ct. 1354 (holding that the Sixth Amendment is not subject to the "vagaries of the rules of evidence").

In *United States v. Stone*, 432 F.3d 651, 654 (6th Cir.2005), the Sixth Circuit suggested that an expert witness may not rely on testimonial hearsay in a criminal case, although the Court found that the expert actually relied only on evidence that was properly admitted. The Court dealt with a *Crawford* challenge to an expert witness's testimony as follows:

> Defendants, however, do not point to any testimony by Agent Cantrell that was not supported by prior in-court witness testimony or by documents properly admitted into evidence. In fact, the Government points to an exchange in which Agent Cantrell indicated that her expert opinions were based on witness testimony and documents properly admitted into evidence. Because Defen-

dants do not establish that Agent Cantrell relied on out-of-court interviews of witnesses not called to testify, their *Crawford* argument is not well taken. As this *Crawford* argument is the only assignment of error relating to guilt Defendants make on appeal, their convictions are affirmed.

*Id.* at 654. The Court then noted that the expert witness did rely on testimonial hearsay when he testified during the sentencing phase, but that the *Crawford* confrontation rights do not extend to that phase of the proceeding. *Ibid.*

The Second Circuit cited *Stone,* but reached a slightly different result in *United States v. Lombardozzi,* 491 F.3d 61, 73–74 (2d Cir.2007). The court held that the district court did not commit plain error because the expert's testimony "was fully supported by evidence that can in no way be considered testimonial," and therefore the expert was not "directly conveying" to the jury testimonial hearsay. *Id.* at 73. Similarly, the D.C. Circuit recently held that relying on, but not relating to the jury, testimonial hearsay did not violate the Confrontation Clause. *United States v. Law,* 528 F.3d 888, 912 (D.C.Cir.2008). The information in that case covered the broad spectrum of a narcotics officer's interviews over several years, upon which he formed his opinions of how drug dealers operate.

 The present case presents a different problem. In order for the expert's opinion on whether the laboratory instrument readings indicate cocaine to be relevant, there must be information in the record to prove what was tested. *See United States v. Grant,* 967 F.2d 81, 82–83 (2d Cir.1992) ("In order for the chemist's testimony to be relevant, there must be some likelihood that the substance tested by the chemist was the substance seized at the airport. The government's failure to establish a chain of custody from the mo-

ment the substance was seized to the time it was subjected to laboratory analysis makes this less likely, and thus casts some doubt on the admissibility of the chemist's testimony.") In other words, the government must offer evidence that establishes a foundation for the test results that satisfies the Court making the admissibility decision under Rules 104 and 901, but there also must be evidence from which a rational juror could conclude that Williams tested the substance later removed from the property room by the defendant. *See Douglass v. Eaton Corp.,* 956 F.2d 1339, 1348 (6th Cir.1992) (Ryan, J., concurring), *abrogated on other grounds by Weisgram v. Marley Co.,* 528 U.S. 440, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000). Williams's report cannot furnish that link without violating the hearsay rule and the Confrontation Clause. Rule 703 states: "Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." But even this balancing test, heavily weighted in favor of exclusion, is not available to the government. The *Crawford* decision represents "a fundamental re-conception of the Confrontation Clause," *United States v. Cromer,* 389 F.3d 662, 671 (6th Cir.2004), and disavows the idea that judicial balancing tests can substitute for cross-examination. By allowing the court the option of admitting otherwise inadmissible evidence, for example, Rule 703 could be understood to contemplate the very judicial balancing that *Crawford* eschews.

 The Court concludes that Mr. Williams's laboratory reports may not be used to authenticate the instrument printouts. However, there may be other methods by which the government could au-

thenticate the exhibits. *See generally* Fed.R.Evid. 901(b). "Physical evidence is admissible when the possibilities of misidentification or alteration are 'eliminated, not absolutely, but as a matter of reasonable probability.'" *United States v. Allen,* 106 F.3d 695, 700 (6th Cir.1997) (quoting *United States v. McFadden,* 458 F.2d 440, 441 (6th Cir.1972)). At oral argument, the government insisted that it would be able to establish a chain of custody of the cocaine and prove—without resort to inadmissible hearsay—that the laboratory printouts from Mr. Williams's testing related to the drugs that eventually were removed from the property room and replaced with non-controlled substances. The Court cannot rule out the possibility that the government might succeed in that effort, and it will not foreclose the government's attempts. Therefore, the Court will deny the defendant's motion *in limine* at this time insofar as it relates to evidence of the composition of the substance removed from the property room.

## IV.

The Court finds that the defendant's proposed evidence of allegations appearing in recent media reports of inaccuracies involving the firearms unit of the Detroit Police Department's crime laboratory is irrelevant and inadmissible. However, evidence relating to the facts and circumstances involved in another prosecution involving Detroit Police Officers accused of stealing drugs from the property room, and other allegations of misconduct involving Detroit Police Officers, including narcotics officers, may be relevant and admissible at trial. The defendant may offer evidence of his own good character, but that evidence must take the form of reputation or opinion testimony, and the witnesses may not offer opinions on the guilt or innocence of the defendant in this case. The government's evidence of the field tests of the substance in question is inadmissible, but the Court cannot declare at this time that evidence offered through Detroit crime laboratory employees as to the testing of the substance in question is inadmissible.

Accordingly, it is **ORDERED** that the government's motion *in limine* [dkt # 29] is **GRANTED IN PART AND DENIED IN PART.** The defendant may not offer evidence of irregularities in the firearms unit of the Detroit police crime laboratory, and his character evidence may be offered only through testimony as to reputation or opinion, provided that no witness may testify to opinions on the guilt or innocence of the defendant in this case.

It is further **ORDERED** that the defendant's motion *in limine* [dkt # 28] is **GRANTED IN PART AND DENIED IN PART.** The government may not offer evidence of the field test known as a "presumptive test" or "Travnikoff test" performed on the substance in question. However, the government may attempt to establish a foundation for the laboratory instrument test results for the tests run by Michael Williams.

It is further **ORDERED** that the parties shall appear before the Court for a status conference on **November 24, 2008 at 4:00 p.m.** to establish trial and other case management dates.