S07G1789. CUYUCH v. THE STATE.
(667 SE2d 85)

SEARS, Chief Justice.

We granted certiorari in this case to consider whether the Court of Appeals erred in affirming the trial court's admission into evidence of statements made to police officers by the victim and one of the victim's friends.[1] Because the statements were inadmissible under *Crawford v. Washington*[2] and its progeny, we reverse the Court of Appeals' judgment.

1. Officer Isin of the Canton Police Department testified that, on September 30, 2001, about 1:30 a.m., he was approached by 16-year-old Juan Pasqual, who was bleeding heavily from a cut on his left arm. Officer Isin asked Pasqual what had happened, and Pasqual told him that his roommate, later identified as the appellant, Leonardo Cuyuch, had cut him. Officer Isin asked Pasqual where he lived and if his roommate was still home. Pasqual told Isin that he lived at 280 Scott Mill Road and that his roommate was still home. Officer Isin testified that the address was only about 300 feet from where he first encountered Pasqual.

At that point, another officer, Sergeant Lummus of the Canton Police Department, arrived on the scene as backup. Officer Isin

---

[1] *Cuyuch v. State*, 286 Ga. App. 629 (649 SE2d 856) (2007).
[2] 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004).

testified that he stayed with Pasqual while Sergeant Lummus drove toward the address given by Pasqual to see if Cuyuch was still there. Officer Isin testified that, as a medical unit arrived and was treating Pasqual, Sergeant Lummus called Isin and told him that he (Lummus) had arrested Cuyuch. Officer Isin then drove Pasqual to his residence "to identify the person." According to Isin, when they arrived, Cuyuch was handcuffed and sitting in the back of Sergeant Lummus's car, and Pasqual identified Cuyuch as the person who had cut him.

Sergeant Lummus testified that, as he drove toward the address that Pasqual had given, he saw a man, Francisco Lorenzo, standing on the side of the road yelling that his friend needed help. Sergeant Lummus added that there was a language barrier and that he could not understand who needed help. Lummus then had Lorenzo get in his car and show him where he wanted to go. Lorenzo took him to 280 Scott Mill Road. Officer Lummus added that, when they arrived at the residence, "whatever happened had already happened prior to [his] arrival," that Cuyuch was sitting on a sofa, that another person was sitting in a chair across from Cuyuch, and that the two of them were watching television. Officer Lummus also testified that, during his ensuing investigation, the person sitting across from Cuyuch did not appear to be afraid of Cuyuch and that Cuyuch never tried to leave the premises.

Once Sergeant Lummus and Lorenzo went into the house, Lorenzo repeated that his friend needed help and pointed to Cuyuch. Because Cuyuch did not appear to need help, Lummus contacted a translator in the hope of better understanding what Lorenzo was trying to communicate. Sergeant Lummus testified that he asked the translator to help Lorenzo explain who needed help. Sergeant Lummus added that, after the translator spoke to Lorenzo, the translator told Lummus that Lorenzo said that "his friend Pasqual" was the one who needed help, that "he had been badly cut," and that "the person sitting on the couch [i.e., Cuyuch] was the person who had cut him." The translator also told Sergeant Lummus that Lorenzo knew where the weapon was thrown, and Lummus had Lorenzo show him where the weapon was. Sergeant Lummus recovered the weapon, a carpenter's knife, in the yard.

Pasqual and Lorenzo apparently could not be located at the time of trial and did not testify. Similarly, the translator did not testify. Based on the foregoing evidence, Cuyuch was convicted of aggravated battery. On appeal, the Court of Appeals affirmed.

2. Under *Crawford v. Washington*, "the admission of out-of-court statements that are testimonial in nature violates the Confrontation Clause unless the declarant is unavailable and the defendant

had a prior opportunity for cross-examination."[3] Statements made by witnesses to police officers investigating a crime are testimonial in nature "when the primary purpose" of the statements is "to establish or prove past events potentially relevant to later criminal prosecution."[4] Such testimonial statements may not be admitted into evidence unless the requirements of *Crawford* are satisfied.[5] On the other hand, however, statements made by witnesses to questions of investigating officers are nontestimonial when they are made primarily "to enable police assistance to meet an ongoing emergency."[6] Such nontestimonial out-of-court statements are admissible if they meet one of this State's hearsay exceptions.[7] Moreover, as the Supreme Court emphasized in *Davis*, when police questioning of a witness exists, "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate."[8]

An examination of the Supreme Court's application of these principles to *Davis* and its companion case, *Hammon v. Indiana*, is useful to resolving the present case. In *Davis*, a woman, Michelle McCottry, called 911 and described an ongoing emergency to the 911 operator, telling the operator that "he" was hitting her and "jumpin' on" her. In response to a question by the operator, the caller gave the operator the perpetrator's name, Adrian Davis, and then told the operator that he had run out the door and left in a car.[9]

In *Hammon*, the police responded to a report of domestic abuse and found Ms. Hammon on the front porch of her home. She told the officer that there was nothing wrong, but when the police entered the house (with Ms. Hammon's permission), they saw broken glass on the floor and a damaged gas heating unit. Mr. Hammon, who was in the kitchen, told the officers that he and his wife had been in an argument but that he had not physically assaulted her. Upon questioning by one of the officers, however, Ms. Hammon stated that

---

[3] *Pitts v. State*, 280 Ga. 288, 288 (627 SE2d 17) (2006). See *Crawford*, 541 U. S. at 68.

[4] *Davis v. Washington*, 547 U. S. 813, 822 (126 SC 2266, 165 LE2d 224) (2006). Accord *Hester v. State*, 283 Ga. 367, 370-372 (659 SE2d 600) (2008); *Pitts*, 280 Ga. at 289-291; *Brawner v. State*, 278 Ga. 316, 318-319 (2) (602 SE2d 612) (2004); *Bell v. State*, 278 Ga. 69, 71-72 (597 SE2d 350) (2004).

[5] *Davis*, 547 U. S. at 821.

[6] Id. at 822. Accord *Hester*, 283 Ga. at 370.

[7] *Pitts*, 280 Ga. at 288, 291.

[8] *Davis*, 547 U. S. at 822, n. 1. See Robert P. Mosteller, *Softening the Formality and Formalism of the "Testimonial" Statement Concept*, 19 Regent U. L. Rev. 429 (2006-2007) (focusing on a single perspective – the intent of the declarant or the questioner – is not required under Confrontation Clause and focusing on intent of declarant is appropriate).

[9] *Davis*, 547 U. S. at 817-818.

Mr. Hammon had broken the furnace, hit her in the chest, and thrown her onto the broken glass.[10]

In *Davis*, the Court concluded that the questions by the 911 operator had not produced testimonial statements. The Court reasoned that statements made during an interrogation that established "facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator" would be testimonial.[11]

> The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial. It is, in the terms of the 1828 American dictionary quoted in *Crawford*, " '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " [*Crawford v. Washington*, 541 U. S. at 51].[12]

To support this conclusion, the Court noted that "[t]he solemnity of even an oral declaration of relevant past fact to an investigating officer is well enough established by the severe consequences that can attend a deliberate falsehood. See, e.g., *United States v. Stewart*, 433 F.3d 273, 288 (CA2 2006) (false statements made to federal investigators violate 18 U.S.C. § 1001)."[13]

In examining McCottry's statements in *Davis*, the Court concluded that because "McCottry was speaking about events as they were actually happening, rather than 'describ(ing) past events,' "[14] and because she was facing and attempting to resolve an ongoing emergency, she was not attempting to be a witness against Davis, and her statements thus were not testimonial.[15] The Court did note, however, that during such an emergency, some statements could be considered testimonial and some nontestimonial and that the testimonial statements should be excluded from evidence.[16]

In *Hammon*, the Court concluded that Ms. Hammon's statements were testimonial, as there was no emergency in progress and

---

[10] Id. at 819-820.

[11] Id. at 826.

[12] Id. at 827.

[13] Id. Similarly, in Georgia, "[a] person who willfully and knowingly gives or causes a false report of a crime to be given to any law enforcement officer or agency of this state is guilty of a misdemeanor." OCGA § 16-10-26.

[14] Id. at 827 (quoting *Lilly v. Virginia*, 527 U. S. 116, 137 (119 SC 1887, 144 LE2d 117) (1999)).

[15] Id. at 827-828.

[16] Id. at 828.

as the statements she made in response to police questions recounted "potentially criminal past events."[17] The Court stated that, because Ms. Hammon's statements "were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial" and did not detract from the conclusion that the statements were testimonial.[18]

3. In the present case, we assume without deciding that the primary purpose of Pasqual's statements to Officer Isin — that his roommate had cut him and was still at home — were made to enable Officer Isin to meet an ongoing emergency and thus were nontestimonial in nature. It is clear, however, that the primary purpose of Pasqual's identification of Cuyuch at the crime scene was to establish past facts with a view to a future prosecution. As such, Pasqual's statement identifying Cuyuch was testimonial in nature and thus inadmissible hearsay since Cuyuch did not have a prior opportunity to cross-examine Pasqual.

Moreover, evaluating Lorenzo's statements when he and Sergeant Lummus arrived at the residence where the crime occurred, we acknowledge that it is possible that Sergeant Lummus thought he was dealing with a crime victim other than Pasqual at the residence and thus thought he might be dealing with an ongoing emergency. However, as *Davis* counsels, "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate."[19] Thus, we must determine whether Lorenzo, in response to Sergeant Lummus's and the translator's questions, was primarily attempting to deal with an ongoing emergency, as was McCottry in *Davis*, or whether he was attempting to describe past events and serve as a witness against Cuyuch.

We conclude that the record shows that, in critical part, Lorenzo was primarily describing past events and was attempting to provide evidence against Cuyuch. At the outset, we note that Lorenzo's statements were not made to curtail any emergency threat from Cuyuch, as the uncontradicted testimony is that, while Lorenzo and Sergeant Lummus were in the house, Cuyuch was calmly watching television with another person. Admittedly, the record does not show whether Lorenzo knew whether Pasqual was still at the residence or had left the residence when he and Sergeant Lummus arrived. Thus, it is unclear whether Lorenzo was attempting in any way to obtain

---

[17] Id. at 830. Accord *Pitts*, 280 Ga. at 291.

[18] *Davis*, 547 U. S. at 832.

[19] Id. at 822, n. 1.

emergency aid for Pasqual by identifying Pasqual as the person who needed help.

In any event, however, Lorenzo's statements that he knew that the knife was in the front yard and that Cuyuch was the person who had stabbed Pasqual cannot be said to have been given primarily to assist in providing aid to Pasqual. Instead, these statements, made in response to a question by Sergeant Lummus through the translator as to who needed help, were describing past events and identified and reported Cuyuch as the perpetrator of a past crime. At that point, Lorenzo was effectively "acting as a witness"[20] against Cuyuch. As noted in *Davis*, reporting to an officer that a person has committed a past crime is a solemn act that can have severe consequences if false.[21] For the foregoing reasons, we conclude that these solemn declarations of Lorenzo were testimonial in nature. Accordingly, Lorenzo's out-of-court statements were inadmissible since Cuyuch had not had a prior opportunity to cross-examine Lorenzo.

Because the inadmissible hearsay statements of Pasqual and Lorenzo may not be considered in evaluating the sufficiency of the evidence to support Cuyuch's conviction,[22] and because, without that evidence, the evidence is wholly insufficient for a rational trier of fact to have found Cuyuch guilty of aggravated battery beyond a reasonable doubt,[23] we must reverse Cuyuch's conviction.

*Judgment reversed. All the Justices concur.*

DECIDED SEPTEMBER 22, 2008.

*Carlton C. Carter*, for appellant.
*Garry T. Moss, District Attorney, Wallace W. Rogers, Jr., Samuel K. Barger, Assistant District Attorneys*, for appellee.

---

[20] Id. at 828.

[21] Id. at 826; OCGA § 16-10-26 ("A person who willfully and knowingly gives or causes a false report of a crime to be given to any law enforcement officer or agency of this state is guilty of a misdemeanor.").

[22] *Woodruff v. Woodruff*, 272 Ga. 485, 488 (531 SE2d 714) (2000); *Walsh v. State*, 269 Ga. 427, 428 (499 SE2d 332) (1998).

[23] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).