A10A2245. PHILPOT v. THE STATE.
(709 SE2d 831)

DILLARD, Judge.

Following a jury trial, Joshua E. Philpot was convicted on two counts of burglary, one count of being a "Peeping Tom," one count of entering an automobile, one count of simple assault, and two counts of criminal trespass. Philpot appeals his convictions and the denial of his motion for a new trial, arguing that the trial court erred by admitting similar-transaction evidence without making the requisite findings on the record and by admitting impermissible testimonial evidence regarding that similar transaction in violation of his right to confrontation under the Sixth Amendment to the United States Constitution. For the reasons set forth infra, we affirm.

Viewed in the light most favorable to the verdict,[1] the evidence presented at trial shows that around 7:00 a.m. on May 7, 2008, the homeowner victim was asleep in the bedroom of her suburban home when her husband left the house to go to work. As was his normal

---

[1] *Davis v. State*, 275 Ga. App. 714, 715 (1) (621 SE2d 818) (2005).

routine, the victim's husband exited the house through a door leading into the garage, opened the automatic garage door by pressing a button located on the garage wall, and then drove his vehicle out of the garage onto the driveway. And because he had recently lost his vehicle's remote garage-door opener, the victim's husband went back into the garage and closed the garage door before exiting the garage through a back door. The victim also normally parked her vehicle inside the garage (because its locks did not always work), but she neglected to do so the previous evening, and on this particular morning her car—where she kept her remote garage-door opener—was parked on the driveway.

A few minutes after her husband drove off to work, the victim was awakened by a noise in her bedroom. Believing that her husband was perhaps running late, she called out, "Honey, are you still in?" But when an unfamiliar voice replied, the victim quickly sat up and saw a young man, whom she did not recognize, standing at the foot of her bed holding a pillow. The victim immediately began screaming at the intruder to leave, which he did post haste. She then woke up her younger cousin, who had been staying at her home and was sleeping in the spare bedroom. Unsure as to whether the intruder was still inside, the two women quickly exited the house while the victim called the police on her cell phone.

Shortly thereafter, the police arrived, and the victim provided them with a description of the intruder. The police then searched the house for the intruder, found no one inside, and ultimately concluded that nothing had been stolen (despite the fact that the home contained numerous electronics and cash left in plain view). On the floor inside of the victim's garage, the police found a partially smoked cigarette, but the victim informed them that no one living in the house was a cigarette-smoker. As part of their investigation, the police also spoke to the victim's next-door neighbor, who told them that while she and her daughter were eating breakfast that morning, they saw a young man running through their back yard from the direction of the victim's house. When the young man paused for a moment, the neighbor's daughter was able to see his face clearly and recognized him as a neighbor, who lived in a house across the street with his mother. Consequently, the police went to that house and initially spoke to Joshua Philpot's mother. She informed the police that the young man lived with her and allowed them to come inside her home to speak with him. Philpot initially denied any involvement, but the police still arrested him because his physical appearance and the clothing found in his room matched the description provided by the victim and her neighbor's daughter. During the subsequent interrogation at the police station, Philpot admitted to entering the victim's home through the garage that morning to see

"what was in it," going into the victim's bedroom, and fleeing when the victim screamed at him.

Thereafter, Philpot was indicted on two counts of burglary,[2] one count of being a "Peeping Tom,"[3] one count of entering an automobile,[4] one count of simple assault,[5] and two counts of criminal trespass.[6] During the trial, the victim testified about waking up to find Philpot in her bedroom, and her neighbors testified about witnessing Philpot running away from the victim's house and through their back yard on the morning of the incident. Several police officers also testified as to their investigation and interrogation of Philpot.

Additionally, the State presented similar-transaction evidence, which showed that several years prior to this incident, Philpot pleaded guilty to a burglary charge. In that earlier case, Philpot attempted to enter a woman's home through a window during the morning hours, but fled when the woman saw him and began screaming. After the State rested, Philpot testified that he did, in fact, enter the victim's home, but claimed that he only did so because he noticed that the victim's garage door had been left open that morning, and upon further investigation saw that the door connecting the garage to the interior of the house was also left open. For this reason, Philpot claimed that he went inside the home merely for the purpose of informing the homeowners of the situation and to ensure that nothing was wrong at the residence. Nevertheless, at the conclusion of the trial, the jury found Philpot guilty on all counts. Subsequently, Philpot filed a motion for a new trial, which the trial court denied. This appeal follows.

1. We first address Philpot's contention that the trial court erred by admitting the out-of-court statements that the victim of his prior burglary provided to the officer who investigated that crime. Specifically, Philpot argues that allowing the investigating officer to testify as to what the prior victim told him about the past burglary violated his right of confrontation under the Sixth Amendment to the United States Constitution. We disagree.

(a) The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[7] This ancient right

---

[2] OCGA § 16-7-1 (a).

[3] OCGA § 16-11-61 (a).

[4] OCGA § 16-8-18.

[5] OCGA § 16-5-20 (a) (2).

[6] OCGA § 16-7-21 (b) (1).

[7] U. S. Const. amend. VI.

dates back to Roman times,[8] and is a "bedrock procedural guarantee [that] applies to both federal and state prosecutions."[9] And in 2004, the Supreme Court of the United States clarified the original meaning and scope of the right to confrontation of one's accusers in *Crawford v. Washington*,[10] holding that "the admission of out-of-court statements that are testimonial in nature violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination."[11] In analyzing *Crawford* and its progeny to determine whether an out-of-court statement is "testimonial" or "nontestimonial," our Supreme Court has explained that

> [s]tatements made by witnesses to police officers investigating a crime are testimonial in nature when the primary purpose of the statements is to establish or prove past events potentially relevant to later criminal prosecution. Such testimonial statements may not be admitted into evidence unless the requirements of *Crawford* are satisfied. On the other hand, however, statements made by witnesses to questions of investigating officers are nontestimonial when they are made primarily to enable police assistance to meet an ongoing emergency. Such nontestimonial out-of-court statements are admissible if they meet one of this State's hearsay exceptions.[12]

(b) While this case was pending, the Supreme Court of the United States published its decision in *Michigan v. Bryant*,[13] which—as some scholars have already noted[14]—substantially alters

---

[8] *See Coy v. Iowa*, 487 U. S. 1012, 1015 (II) (108 SC 2798, 101 LE2d 857) (1988); *see generally* Herrmann & Speer, "Facing the Accuser: Ancient and Medieval Precursors of the Confrontation Clause," 34 Va. J. Int'l L. 481 (1994).

[9] *Crawford v. Washington*, 541 U. S. 36, 42 (II) (124 SC 1354, 158 LE2d 177) (2004); *see also Pointer v. Texas*, 380 U. S. 400, 406 (II) (85 SC 1065, 13 LE2d 923) (1965).

[10] 541 U. S. at 68 (V) (C).

[11] *Cuyuch v. State*, 284 Ga. 290, 291-92 (2) (667 SE2d 85) (2008) (punctuation omitted) (describing holding of *Crawford v. Washington*).

[12] *Id*. at 292 (2) (punctuation and footnotes omitted); *see also Davis v. Washington*, 547 U. S. 813, 822 (II) (126 SC 2266, 165 LE2d 224) (2006).

[13] ___ U. S. ___ (131 SC 1143, 179 LE2d 93) (2011).

[14] *See, e.g.*, The Confrontation Blog, http://confrontationright.blogspot.com/2011/03/preliminary-thoughts-on-bryant-decision.html (March 2, 2011) ("For the first time, the Court has purported to give a broad, general approach to determining what is testimonial. It takes the 'primary purpose' language of *Davis* and expands on it. Now, 'primary purpose' is not simply a test to choose between whether a statement is testimonial or instead made in response to an 'ongoing emergency.' Rather, it appears, the accused now has the burden of establishing that the primary purpose of the conversation in which the witness's statements were made was to 'creat(e) an out-of-court substitute for trial testimony.' "); Posting of Colin Miller to

and expands the framework for analyzing whether an out-of-court statement being challenged on Confrontation Clause grounds is testimonial or nontestimonial in nature.[15] The facts of *Bryant* are as follows. Around 3:30 a.m., Detroit, Michigan police officers responded to a dispatch indicating that a man had been shot.[16] At a local gas station parking lot, the officers found the victim lying on the ground next to his car and suffering from a gunshot wound to his abdomen.[17] When asked by the police "what had happened, who had shot him, and where the shooting had occurred," the victim stated that Bryant had shot him.[18] The victim further explained that he had engaged in a conversation with Bryant, whom he recognized based on his voice, through the back door of Bryant's house and that when he turned to leave, he was shot through the door, after which he drove to the gas station.[19] The victim's conversation with police ended within ten minutes when EMTs arrived.[20] He was then transported to the hospital but died a few hours later.[21] In the meantime, police went to Bryant's house, and although they did not find Bryant there, they did discover blood and a bullet on the back porch, a bullet hole in the back door, and the victim's wallet outside the house.[22]

The issue presented in *Bryant* was whether the officers could testify, consistent with the Confrontation Clause, about the statement the victim made to them before he died. In its opinion, the Supreme Court revisited its lines of reasoning and holdings in *Crawford* and *Davis v. Washington*, and in doing so explained that these decisions established, in rather broad terms, the outer parameters of analyzing whether an out-of-court statement made by a witness to a state actor is "testimonial" or "nontestimonial" for

---

EvidenceProf Blog, http://lawprofessors.typepad.com/evidenceprof/2011/02/supreme-court-issues-opinion-in-michigan-v-bryant.html (February 28, 2011) (noting that in *Bryant*, the Court (1) adopted an objective test for determining whether statements are "testimonial"; and (2) concluded that this test should focus upon the statements and actions of both the interrogator and the declarant).

[15] *See Bryant*, 131 SC 1143, at 1168 (Scalia, J., dissenting) (claiming that the majority's opinion "distorts our Confrontation Clause jurisprudence and leaves it in a shambles"); *id.* at 1170 (I) (A) ("The only virtue of the [majority's] approach (if it can be misnamed a virtue) is that it leaves judges free to reach the 'fairest' result under the totality of the circumstances"); *id.* at 1174 (II) (A) ("But today's decision . . . is a gross distortion of the law—a revisionist narrative in which reliability continues to guide our Confrontation Clause jurisprudence, at least where emergencies and faux emergencies are concerned").

[16] *Id.* at 1150 (I).

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

Confrontation Clause purposes.[23] Specifically, the *Bryant* Court noted that "[t]he basic purpose of the Confrontation Clause was to 'targe(t)' the sort of 'abuses' exemplified at the notorious treason trial of Sir Walter Raleigh," and thus, "the most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial."[24] This is because, according to *Bryant*, "[e]ven where such an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair to the accused if they are untested by cross-examination."[25] The *Bryant* Court then noted that, "[w]hether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial."[26] And on the other end of the testimonial-nontestimonal spectrum, the *Bryant* Court noted that "[w]hen, as in *Davis*, the *primary purpose* of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause."[27] The *Bryant* Court then clarified and greatly expanded upon the potential range of nontestimonial statements, noting:

> But there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. *In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.*[28]

The new analytical framework for assessing whether an out-of-court statement implicates the Confrontation Clause, then, is still one that seeks to discern the primary purpose behind that statement, but which also recognizes that "standard rules of hearsay," and their respective indicia of reliability, are relevant to a court's primary-

---

[23] *Id.* at 1176 (I)-(II).
[24] *Id.* at 1155 (II) (citation omitted).
[25] *Id.* at 1168 (II).
[26] *Id.*
[27] *Id.* (citation omitted; emphasis supplied).
[28] *Id.* at 1175 (II) (emphasis supplied).

purpose inquiry.[29]

Likewise significant is the *Bryant* Court's "additional clarification with regard to what *Davis* meant by 'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency,' "[30] which requires a court to "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties."[31] In explaining this line of inquiry, the *Bryant* Court noted that

> [a]n objective analysis of the circumstances of an encounter and the *statements and actions of the parties* to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs—*e.g.*, at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards—are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.[32]

And in conducting this objective analysis, "the existence of an 'ongoing emergency' *at the time of an encounter between an individual and the police* is among the most important circumstances informing the 'primary purpose' of an interrogation."[33] This is because the "existence of an ongoing emergency . . . focuses the

---

[29] *See id.* at 1157 (III) (B) & n. 9 (noting that the logic underlying the treatment of statements made during an ongoing emergency as nontestimonial is similar to that underlying the admission of certain hearsay statements made under circumstances that eliminate the possibility of fabrication, coaching, or confabulation—*e.g.*, excited utterances; statements by a co-conspirator during and in furtherance of the conspiracy; statements for purposes of medical diagnosis or treatment; records of regularly conducted activity; public records and reports; records of vital statistics; records of religious organizations; marriage, baptismal, and similar certificates; family records; statements against interest; business records, etc.); *cf. id.* at 1159 (III) (B) (explaining that "[t]he medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds lights on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one," and that "[t]he victim's medical state also provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public").

[30] *Id.* at 1167 (II) (quoting *Davis*, 547 U. S. at 822).

[31] *Id.* at 1147 (III).

[32] *Id.* at 1156 (III) (A).

[33] *Id.* at 1155 (III) (B) (emphasis supplied); *see also id.* at 1157 (III) (B), n. 8 ("The existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the

participants on something other than 'prov(ing) past events potentially relevant to later criminal prosecution,' "[34] *i.e.*, on ending the threatening situation.[35] Put another way, "the prospect of fabrication in statements given for the primary purpose of resolving [an] emergency is presumably significantly diminished," and therefore, "the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination."[36]

The *Bryant* Court also rejected the "unduly narrow understanding of 'ongoing emergency' " employed by the Supreme Court of Michigan.[37] Specifically, it held that the "Michigan Supreme Court erroneously read *Davis* as deciding that 'the statements made after the defendant stopped assaulting the victim and left the premises did *not* occur during an 'ongoing emergency.' "[38] The *Bryant* Court further explicitly renounced the Supreme Court of Michigan's reading of *Davis* as defining the "outer bounds" of this jurisprudential concept, reasoning that (1) "whether an emergency exists and is ongoing is a highly context-dependent inquiry"; and (2) "[a]n assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue."[39] Nevertheless, it is likewise the case that an emergency cannot be "ongoing in every place or even just surrounding the victim for the entire time that the perpetrator of a violent crime is on the loose," and as such, "a conversation which begins as an interrogation to determine the need for emergency assistance can evolve into testimonial statements."[40] And when this happens (as revealed by an objective assessment of the context in which the statements in question were made), a trial court can exclude from testimony—after considering the relevant *Crawford* factors—the portions of those statements that are testimonial in nature.[41]

---

interrogation at the time, not with the benefit of hindsight. If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause. The emergency is relevant to the 'primary purpose of the interrogation' because of the effect it has on the parties' purpose, not because of its actual existence.").

[34] *Id.* at 1165 (III) (B) (quoting *Davis*, 547 U. S. at 822).

[35] *Id.*

[36] *Id.*

[37] *Id.* at 1155 (III) (B).

[38] *Id.*

[39] *Id.* at 1158 (III) (B). In this respect, the *Bryant* Court also emphasized that "the duration and scope of an emergency may depend in part on the type of weapon employed." *Id.* at 1158 (III) (B).

[40] *Id.* at 1159 (III) (B) (citation and punctuation omitted).

[41] *Id.* at 1159 (III) (B).

This is not to say, as *Bryant* makes clear, that "the existence *vel non* of an ongoing emergency is dispositive of the testimonial inquiry."[42] The overarching inquiry is, of course, to discern the "primary purpose" of the statements made by the declarant.[43] Nevertheless, the existence of an ongoing emergency while the statements in question are being made is unquestionably an "important factor" that "informs the ultimate inquiry" regarding the "primary purpose" of an interrogation.[44] Likewise relevant is "the importance of *informality* in an encounter between a victim and police."[45] This is so even though "[f]ormality is not the sole touchstone of [the] primary purpose inquiry"; because "although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is 'to establish or prove past events potentially relevant to later prosecution,' " informality does not "necessarily indicate the presence of an emergency or the lack of testimonial intent."[46]

In addition to the context in which an encounter between a victim and the police occurs, a trial court must also consider—per *Bryant's* holding—"the statements and actions of both the declarant and interrogators," which "provide objective evidence of the primary purpose of the interrogation."[47] Indeed, in many instances, the "primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers."[48] This "combined approach" has the effect of ameliorating "problems that could arise from looking solely to one participant"—primarily, "the problem of mixed motives on the part of both interrogators and declarants."[49]

In sum, when a court "must determine whether the Confrontation Clause bars the admission of a statement at trial," it should seek to ascertain, if possible, the "primary purpose of the interrogation" by "objectively evaluating the statements and actions of the parties

---

[42] *Id.* at 1160 (III) (B).

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.* at 1160 (III) (C). We note that in *Cuyuch*, our Supreme Court, relying on *Davis*, held that "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate," in order to determine whether the primary purpose of a witness's statement was to address an ongoing emergency. 284 Ga. at 294 (3). While this Court obviously has no authority to overrule *Cuyuch* in any respect, we are nevertheless compelled, on matters of federal constitutional law, to adhere to *Bryant's* directive that the statements and actions of interrogators must also be considered when determining the primary purpose of a declarant's statement to the police.

[48] *Id.* at 1161 (III) (C).

[49] *Id.* at 1161 (III) (C).

to the encounter, in light of the circumstances in which the interrogation occurs."[50]

(c) In the case sub judice, the officer who investigated the prior burglary testified that on the date in question, he responded within a few minutes to a report that a burglary had occurred only moments before at the home of the prior victim. Upon the officer's arrival at the prior victim's home, she told him that she heard a noise in her kitchen, and that when she went to investigate it, she saw a young man (later identified as Philpot) climbing into her home through the kitchen window while holding a knife. She further told the officer that once she began screaming, the young man fled. After speaking with the officer for a few more minutes, the prior victim looked out her window and exclaimed that the burglar (Philpot) was standing in the back yard of a home across the street. Consequently, the officer immediately began chasing Philpot and eventually arrested him.

Given our review of the record, we conclude that the prior victim's statements to the officer were primarily offered to enable police assistance to meet an ongoing emergency, and are therefore nontestimonial in nature; as such, the complained-of statements do not implicate the safeguards afforded by the Confrontation Clause. Here, the officer responded to the prior victim's 911 call within just a few minutes and found her to still be "shaken up" from her confrontation with the burglar as he questioned her in the home's kitchen (an informal setting). Accordingly, under our case law, the prior victim's statements to the officer were admissible as part of the res gestae of the crime (which, as noted supra, is a relevant consideration under *Bryant*).[51] Additionally, while the (at that time) unidentified burglar had already fled the scene of the prior victim's home by the time the officer arrived, it could have reasonably been presumed by both the prior victim and the officer that the burglar, who had just left the scene of the crime armed with a knife, was still in the immediate vicinity. Thus, while the prior victim was no longer being *immediately* threatened, similar to the situation in *Bryant*, the armed perpetrator was still on the loose, and thus continued to pose a serious potential threat to the prior victim and her neighbors. Indeed here, the police officer, unlike the officers in *Bryant*, had reason to believe that the armed perpetrator was still in the

---

[50] *Id.* at 1162 (IV).

[51] *See* OCGA § 24-3-3 ("Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, shall be admissible in evidence as part of the res gestae."), *see, e.g., Mubarak v. State*, 305 Ga. App. 419, 422 (3) (699 SE2d 788) (2010) (holding that victim's statements to officer made shortly after aggravated assault were admissible as res gestae); *Sharif v. State*, 272 Ga. App. 660, 661 (1) (613 SE2d 176) (2005) (same).

immediate area. In sum, because the circumstances surrounding the interrogation, as well as the statements and actions of the prior victim and responding officer, objectively indicate that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency, the prior victim's identification of Philpot as the burglar and her description of his actions were not testimonial in nature and did not violate the Confrontation Clause.[52]

2. We now address Philpot's remaining enumeration of error. Philpot contends that the trial court erred in admitting the similar-transaction evidence without making the findings required by *Williams v. State*[53] on the record. We find that the trial court did not err in ruling that the similar-transaction evidence was admissible.

It is well established that "[t]he decision of a trial court to admit evidence of similar transactions will be upheld unless clearly erroneous."[54] Under *Williams*,

> [t]o be admissible for the purposes of establishing motive, intent, course of conduct or bent of mind, the State must show (a) sufficient evidence that the similar transaction occurred and (b) sufficient connection or similarity between the similar transaction and the crime alleged so proof of the former tends to prove the latter.[55]

Furthermore, "[w]hen considering the admissibility of similar transaction evidence, the proper focus is on the similarities, not the differences, between the separate crime and the crime in question."[56]

At a pre-trial hearing, the State argued that Philpot's prior burglary was admissible as similar-transaction evidence because the prior offense was similar to the burglary at issue—i.e., that in both instances Philpot entered a suburban home early in the day and then fled before being able to commit a theft or other felony when confronted by the homeowner. The State further argued that it was offering the evidence to show Philpot's intent and guilty knowledge. Following argument by both parties, the trial court ruled that it would allow the similar-transaction evidence, concluding that "the probative value of admitting the evidence substantially outweighs the prejudice to the defendant."

And while the trial court did not make the requisite *Williams* findings on the record, "we find no harmful error as the evidence

---

[52] *See Bryant*, at 1167 (IV).

[53] 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991).

[54] *Payne v. State*, 285 Ga. 137, 138 (674 SE2d 298) (2009).

[55] *Id.*

[56] *Id.*

presented by the State at the [pre-trial] hearing was sufficient for the trial court to have concluded affirmatively on the record that each of the requirements of *Williams* . . . had been satisfied."[57] As previously noted, the State's evidence showed that the two burglaries were fairly similar in nature. Furthermore, when as here, "similar transaction evidence is being introduced to prove motive, intent, or bent of mind, it requires a lesser degree of similarity to meet the test of admissibility than when such evidence is being introduced to prove identity."[58] Accordingly, Philpot's contention that the trial court committed reversible error by not making its findings on the record is without merit.

*Judgment affirmed. Blackwell, J., concurs. Barnes, P. J., concurs in Division 2 and concurs specially.*

BARNES, Presiding Judge, concurring specially.

While I concur fully in Division 2 of the majority opinion, I do not agree with all that is said in Division 1 concerning the admission of the statements to the police officer made by the victim of the prior similar transaction. Therefore, I concur in Division 1, but in the result only. Division 1 of the majority opinion thus decides only the issues in this case and may not be cited as binding precedent. Court of Appeals Rule 33 (a).

The circumstances surrounding the prior victim's statements to the police officer were unique. As the majority indicates, the prior victim made her statements to the officer only a few minutes after her home was burglarized by a young man holding a knife, and the young man was observed standing in a nearby yard during the course of the victim's statement, leading the officer to cut off his conversation with the victim and give immediate chase. In light of these unusual facts, I believe that the "primary purpose of the interrogation" was "to enable police assistance to meet an ongoing emergency" such that the prior victim's statements to the officer were not testimonial hearsay under the framework discussed in *Michigan v. Bryant*, ___ U. S. ___ (131 SC 1143, 179 LE2d 93) (2011). However, neither *Bryant* nor the present case should be construed as opening the floodgates for the admission of out-of-court statements by a

---

[57] *Hinton v. State*, 290 Ga. App. 479, 482 (3) (659 SE2d 841) (2008) (punctuation omitted); *see also Corbitt v. State*, 301 Ga. App. 665, 669 (3) (b) (688 SE2d 642) (2009) (holding that because the evidence at the similar transaction hearing was sufficient for the trial court to conclude that the *Williams* requirements were met, no harmful error resulted from the trial court's failure to make the findings on the record prior to the witness testifying).

[58] *Carter v. State*, 269 Ga. App. 363, 365 (604 SE2d 210) (2004) (punctuation omitted); *see, e.g., Banks v. State*, 225 Ga. App. 754, 755 (2) (484 SE2d 786) (1997) (holding that because a prior burglary was introduced to show defendant's intent to commit theft, less similarity between the prior crime and the present charge was required).

victim or witness merely because the statements occurred at the scene of the crime or would fall within the res gestae exception to the hearsay rule.

DECIDED MARCH 22, 2011 —
RECONSIDERATION DENIED APRIL 11, 2011 —

*Brandon A. Bullard, Colin J. Bellair*, for appellant.
*Fred A. Lane, Jr., District Attorney, Paul E. Hemmann, Anthony B. Williams, Assistant District Attorneys*, for appellee.