28 A.3d 646

William LANGLEY

v.

STATE of Maryland.

No. 51, Sept. Term, 2008.

Court of Appeals of Maryland.

Sept. 19, 2011.

Brian L. Zavin, Assistant Public Defender (Nancy S. Forster, Public Defender, Baltimore, MD), on brief, for Petitioner.

Gary E. O'Connor, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and JOHN C. ELDRIDGE, (Retired, Specially Assigned), JJ.

HARRELL, J.

At the time we granted certiorari and heard oral argument here, this case presented an emerging issue that plagued courts nationwide: determining whether the content of 9–1–1 telephone calls made following the apparent completion of a discrete crime or crimes is considered "testimonial," and thus inadmissible under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), when offered without a live witness—the caller. The Supreme Court's recent *Michigan v. Bryant*, —— U.S. ——, 131 S.Ct. 1143, 179 L.Ed.2d at 93 (2011), however, provides some clarity in what theretofore was a murky jurisprudential crystal ball. This case calls for a relatively straightforward application of *Bryant*.

William Langley ("Langley") appeals from the judgment of the Court of Special Appeals, which affirmed the convictions entered against him in the Circuit Court for Baltimore City. Pertinent to the present posture of this case, the panel of the intermediate appellate court held that certain statements telephoned to police by an eye-witness to portions of events related to a murder-robbery (1) describing an individual alleged to be Langley exiting the crime scene; and (2) identifying features, such as color and license-plate number, of an automobile that another witness at trial testified that Langley had access to, were not "testimonial" within the contemplation of Confrontation Clause jurisprudence, and thus admissible. For reasons to be explained more fully *infra*, we hold that applying *Bryant* to the facts of the present case leads us to

conclude that these statements were non-testimonial, and, therefore, Langley's confrontation rights were not impaired by their admission at his trial. Accordingly, we affirm the judgment of the Court of Special Appeals.

## EVIDENTIARY AND PROCEDURAL BACKGROUND

The State's case at trial demonstrated that, on the evening of 3 October 2005, Nae Chun Pak, the owner of the Cherry Hill Carry–Out on Cherry Hill Road in Baltimore City, was shot and killed in his store. An employee of the store, who testified that Langley was a regular customer of the store, identified Langley at trial as the assailant. The employee testified that he first saw Langley that evening at around 6:00 pm, when he was arguing with Pak at the security window in the store where customers order their food; apparently, Langley was demanding a refund for a cheesesteak sandwich he purchased that was not to his liking. Pak obliged, and Langley left the store. The employee testified further that Langley returned less than an hour later. Pak, with the store busy at the time, was taking orders from a line of customers. Langley pushed one customer aside, raised his arm, and fired one shot at Pak. The employee, having dove to the floor behind the counter, rose to assess the situation and noticed Pak laying on the floor.

As Langley was leaving the store, one Herbert Stokes was waiting on the street in his tow-truck for an acquaintance to get him a bottle of water from a store across the street from the Cherry Hill Carry–Out. After hearing a gunshot, Stokes saw people streaming out of the Cherry Hill Carry–Out, one of whom he identified in the courtroom at trial as Langley. He witnessed Langley get in what he believed to be a white Oldsmobile and drive away. Subsequently, Stokes selected Langley's photograph from a photo array as the person who "looked like the man" who came out of the store and got in the white car.[1]

---

1. Other evidence at trial linked Langley to the crime scene. Following Langley's arrest, police recovered a .380 caliber round from Langley's

Additional evidence about the presence of a white car and a description of the assailant were recounted to a 9–1–1 dispatcher by another person, apparently a female located outside the Carry–Out (who, for some unknown reason, was not produced to testify at trial). Over defense objection, a recording of the 9–1–1–tape recording was admitted into evidence and played for the jury. The following was heard on the recording:

9–1–1 Operator: Baltimore City operator number 1316. What would you like, [police], fire or ambulance?

Caller: I just want to give some information on a shooting that just occurred at Cherry Hill Shopping Center.

9–1–1 Operator: Okay. Let me call the District for that. Let me give you a District number because I don't have that information here.

Caller: Go ahead. [Hurry up. It just happening.][2]

9–1–1 Operator: Are you—

Caller: I seen the guy get in the car. Will you give me the number or not?

9–1–1 Operator: Ma'am, you can—(phone rings)

Caller: Hello?

9–1–1 Operator: Ma'am, you just told me that you had to give information not get information.

Caller: I mean—

9–1–1 Operator: Where do you want to have the Officer sent to?

---

residence. Ballistics testing of a shell casing left at the scene determined that the .380 caliber round recovered from the residence and the shell left at the scene had been chambered in the same gun.

**2.** The original transcript of the trial did not include the bracketed portions of the content of the call. An unopposed motion to correct the record by adding the bracketed words was filed in the Court of Special Appeals to make it part of the record. That motion was granted and no complaint about that action was made here. We assume that the bracketed statements were played for the jury and their omission was simply a transcription oversight.

Caller: I don't want them sent nowhere. They already going out to the store. But the guy, I seen him get in the car. Tag number MRG 908.

9-1-1 Operator: Do you know what type of car it was?

Caller: No, I don't know the type of car. All I know it's white.

9-1-1 Operator: Four door?

Caller: Look like it might have been a four door. I did look at the tag number and it looked like MRG 908.

9-1-1 Operator: Do you know what he was wearing?

Caller: No. Looked like jeans or something in a T-shirt.

9-1-1 Operator: T-shirt, was it dark or light?

Caller: Kind of light. He didn't have no mask, he didn't have no hat, he didn't have nothing on.

9-1-1 Operator: Was he a light-complected man?

Caller: Kind of brown skinned. I didn't know what kind of car it was.

9-1-1 Operator: Now, he was wearing a light top and he was a brown complected man?

Caller: Don't quote me on the color.

9-1-1 Operator: Yes, ma'am.

Caller: I just will tell you about the tag because I looked at it, MRG 908.

9-1-1 Operator: Maryland tag?

Caller: Yes, I believe so. I didn't even look at that.

9-1-1 Operator: What hundred block is that?

Caller: It's in the Cherry Hill Shopping Center. I think that's the 600 block.

9-1-1 Operator: At Cherry Hill Road?

Caller: Yes, Cherry Hill Road.

9-1-1 Operator: Cherry Hill?

Caller: Yes.

9-1-1 Operator: Thank you.

The trial court admitted this portion of the tape, explaining that "[t]he whole tape from the beginning up until after the tag number was given is an excited utterance and admissible." Ultimately, the jury convicted Langley of first-degree murder, use of a handgun in the commission of a crime of violence, and wearing or carrying a handgun. The trial judge imposed a sentence of life-imprisonment for murder, a consecutive twenty-year term for use of a handgun, and a concurrent three-year term for wearing or carrying a handgun.

Langley noted timely an appeal to the Court of Special Appeals. The panel of the intermediate appellate court, in an unreported opinion, relying on *Crawford* and *Davis,* held that the statements in the 9-1-1 tape were non-testimonial, explaining that the 9-1-1 call "was for precisely ... [the] purpose" "to describe current circumstances requiring police assistance." The Court of Special Appeals, in the alternative, explained that "[e]ven if ... the admission of the 911 tape were in error, however, we would be persuaded beyond a reasonable doubt that such error was harmless."

Langley filed timely a petition for writ of certiorari, which we granted, *Langley v. State,* 405 Md. 290, 950 A.2d 828 (2008), to consider the following questions:

1. Did the admission of a recording of a 911 call violate Petitioner's right to confrontation where the call was placed after the offense had been completed and where the alleged perpetrator had left the scene and the caller indicated that she was aware that the police had been notified and were in the process of responding?

2. Was the admission of the recording of the 911 call harmless?

We hold that the statements in the 9-1-1 tape are non-testimonial for Confrontation Clause purposes, and, thus, Langley's confrontation rights were not infringed by the admission of the statements. Accordingly, we affirm the judgment of the Court of Special Appeals.

## STANDARD OF REVIEW

■ The flagship question presented in the present case queries whether certain statements admitted at trial were admitted in violation of Respondent's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. This is a question of law, which we review under a non-deferential standard of review. *See Snowden v. State*, 156 Md.App. 139, 143 n. 4, 846 A.2d 36, 39 n. 4 (2004), *aff'd*, 385 Md. 64, 867 A.2d 314 (2005) ("We ... apply the *de novo* standard of review to the issue of whether the Confrontation Clause was violated in this case.").

## ANALYSIS

■ The Sixth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, *see Brye v. State*, 410 Md. 623, 634, 980 A.2d 435, 441 (2009), provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. This confrontation right "seeks to protect a defendant from the complexities of the legal system and his or her lack of understanding of the law." *Brye*, 410 Md. at 634, 980 A.2d at 441. Currently, regarding Confrontation Clause jurisprudence, "[o]ne question attracting much attention is the status of statements made during 911 calls." Geetanjli Malhotra, *Resolving the Ambiguity Behind the Bright–Line Rule: The Effect of* Crawford v. Washington *on the Admissibility of 911 Calls in Evidence–Based Domestic Violence Prosecutions*, 2006 U. Ill. L.Rev.205, 215 (2006).

In order to understand properly the current state of Confrontation Clause jurisprudence as it relates to 9–1–1 calls, some context is required. In *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 609 (1980), the Supreme Court held that the Confrontation Clause does not bar the admission of statements of an unavailable witness where such statements "bear adequate indicia of reliability," and that such reliability is established where the "evidence falls within a

firmly rooted hearsay exception," or where it bears "particularized guarantees of trustworthiness." (Internal quotation marks omitted.)

Nearly twenty-five years later, in *Crawford, supra,* the Supreme Court overruled *Roberts. See Bullcoming v. New Mexico,* —— U.S. ——, ——, 131 S.Ct. 2705, 2713, 180 L.Ed.2d 610, 636 (2011) ("In a pathmarking 2004 decision, *Crawford* ..., we overruled *Ohio v. Roberts* ...."). In *Crawford,* Crawford was arrested for stabbing a man who tried allegedly to rape Crawford's wife. *Crawford,* 541 U.S. at 38, 124 S.Ct. at 1357, 158 L.Ed.2d at 184–85. At trial, because Crawford's wife invoked the spousal privilege, the prosecution sought to admit the wife's tape-recorded statement made to the police describing the stabbing. *See Crawford,* 541 U.S. at 40, 124 S.Ct. at 1357–58, 158 L.Ed.2d at 185. Importantly, in this statement, contrary to Crawford's version of the events, she testified that the victim had not drawn a weapon before Crawford assaulted him. *See Crawford,* 541 U.S. at 39, 124 S.Ct. at 1357, 158 L.Ed.2d at 185. The trial court, relying on *Roberts, supra,* admitted the wife's statement, offering several reasons why it bore adequate indicia of trustworthiness. *Crawford,* 541 U.S. at 40, 124 S.Ct. at 1358, 158 L.Ed.2d at 186. A jury convicted Crawford of assault. *Crawford,* 541 U.S. at 41, 124 S.Ct. at 1358, 158 L.Ed.2d at 186. Ultimately, the Washington Supreme Court upheld Crawford's conviction, agreeing with the trial court that the statement "bore guarantees of trustworthiness." *Crawford,* 541 U.S. at 41, 124 S.Ct. at 1358, 158 L.Ed.2d at 186. The Supreme Court granted certiorari to determine "whether the State's use of [Crawford's wife]'s statement violated the Confrontation Clause." *Crawford,* 541 U.S. at 42, 124 S.Ct. at 1359, 158 L.Ed.2d at 187.

Explaining that *Roberts's* reliability test was unpredictable and "demonstrated [a] capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude" and after exploring centuries of history relating to the use of ex parte statements as evidence against the accused, the Supreme Court held that only with respect to

"testimonial evidence" does the "Sixth Amendment demand[ ] what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 63, 68, 124 S.Ct. at 1371, 1374, 158 L.Ed.2d at 200, 203. Although "leav[ing] for another day any effort to spell out a comprehensive definition of 'testimonial,'" the Supreme Court enumerated nonetheless a number of "various formulations of this core class of 'testimonial' statements":

> "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial...."

*Crawford,* 541 U.S. at 51–52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193 (internal citations omitted). Applying these formulations to the facts before it, the Supreme Court explained that "[w]hatever else the term covers, it applies at a minimum to ... police interrogations," and, because Crawford did not have a prior opportunity to cross-examine his wife, reversed the judgment of the Washington Supreme Court. *See Crawford,* 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.

Supplying the next piece of the puzzle, in *Davis v. Washington* (and its companion case, *Hammon v. Indiana*), 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Supreme Court undertook to "determine more precisely which police interrogations produce testimony," within the contemplation of Confrontation Clause jurisprudence. *Davis,* 547 U.S. at 822, 126 S.Ct. at 2273, 165 L.Ed.2d at 237. In *Davis,* Davis's former girlfriend called 9–1–1 in the midst of a domestic disturbance with Davis. *Davis,* 547 U.S. at 817, 126 S.Ct. at 2270–71, 165 L.Ed.2d at 234. During the call, she informed the dispatcher that "[h]e's here jumpin' on me again," and that

"[h]e's usin' his fists," and that Davis was the assailant. *Davis,* 547 U.S. at 817–18, 126 S.Ct. at 2271, 165 L.Ed.2d at 234. As the conversation continued, the dispatcher was advised that Davis had "just r[un] out the door," departing in a car with another individual. *Davis,* 547 U.S. at 818, 126 S.Ct. at 2271, 165 L.Ed.2d at 234. Ultimately, the State charged Davis with felony violation of a domestic no-contact order. *Davis,* 547 U.S. at 818, 126 S.Ct. at 2271, 165 L.Ed.2d at 235. Because the former girlfriend did not appear at trial to testify, the trial court admitted a recording of her conversation with the 9–1–1 dispatcher. *Davis,* 547 U.S. at 819, 126 S.Ct. at 2271, 165 L.Ed.2d at 235. A jury convicted Davis of the charge, and the Supreme Court of Washington concluded that the portion of the tape in which the former girlfriend identified Davis was non-testimonial, and if other parts of the tape were testimonial, their admission was harmless beyond a reasonable doubt. *Davis,* 547 U.S. at 819, 126 S.Ct. at 2271–72, 165 L.Ed.2d at 235.

In *Hammon,* police responded to the home of Amy and Hershel Hammon for a reported domestic disturbance. *Davis,* 547 U.S. at 819, 126 S.Ct. at 2272, 165 L.Ed.2d at 235. Upon arrival, the police found Amy on the front porch appearing "somewhat frightened." *Id.* Police went inside the residence to speak with Hershel, who explained to police that he and his wife had "been in an argument." *Id.* By that point, Amy returned inside and police interviewed her in a separate room regarding the incident. *See id.* She signed a "battery affidavit," on which she wrote that Hershel "shoved [her] down on the floor into the broken glass," and that he "[h]it [her] in the chest and threw [her] down." *Davis,* 547 U.S. at 820, 126 S.Ct. at 2272, 165 L.Ed.2d at 235. Amy did not appear to testify at trial. The prosecution called the officer who questioned her at the scene, whereupon the officer authenticated the affidavit and recounted what Amy told him. *Davis,* 547 U.S. at 820, 126 S.Ct. at 2272, 165 L.Ed.2d at 236. The trial judge found Hershel guilty of domestic battery and violating his probation. The Indiana Supreme Court affirmed the conviction, explaining that Amy's statement was not testi-

monial and that, if the affidavit was deemed testimonial and thus admitted wrongly, its admission was harmless beyond a reasonable doubt. *Davis*, 547 U.S. at 821, 126 S.Ct. at 2273, 165 L.Ed.2d at 235.

In its opinion, the Supreme Court explained:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822, 126 S.Ct. at 2273–74, 165 L.Ed.2d at 237. Accordingly, *Davis* established what courts and commentators alike refer to as the "primary purpose test." *See, e.g., Bryant,* —— U.S. at ——, 131 S.Ct. at 1167, 179 L.Ed.2d at 120 (Thomas, J., concurring); *Seely v. State,* 373 Ark. 141, 282 S.W.3d 778, 787 (2008); Gregory M. O'Neil, Davis & Hammon: *Redefining the Constitutional Right to Confrontation,* 40 Conn. L.Rev. 511, 543 (2007). In distinguishing the statements in the consolidated *Davis* case—held to be nontestimonial—from those in *Crawford*—held to be testimonial— the Supreme Court explained that, in *Davis,* the declarant was "speaking about events *as they were actually happening,* rather than describ[ing] past events, that there was an ongoing emergency, [and] that the elicited statements were necessary to be able to *resolve* the present emergency...." [3]

---

**3.** In clarifying that it was not saying "that a conversation which begins as an interrogation to determine the need for emergency assistance cannot ... evolve into testimonial statements," the Court noted, in *Davis,* that "after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (*when Davis drove away from the premises*)." *Davis,* 547 U.S. at 828, 126 S.Ct. at 2277, 165 L.Ed.2d at 241 (emphasis added) (internal citations and quotation marks omitted). Understandably, because the Court in *Davis* suggested that the emergency ended when the defendant left the scene of the crime, many courts read *Davis* as "narrowly

*Bryant*, —— U.S. at ——, 131 S.Ct. at 1154, 179 L.Ed.2d at 106 (some quotation marks omitted). Accordingly, *Davis* stands for the proposition that "where ... the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause." *Bryant*, —— U.S. at ——, 131 S.Ct. at 1155, 179 L.Ed.2d at 107. Ultimately, in the consolidated *Davis* case, the Supreme Court held that the admitted statements were non-testimonial, explaining that the 9–1–1 "call was plainly a call for help against a bona fide physical threat" "necessary ... to resolve the present emergency, rather than to learn (as in *Crawford*) what had happened in the past." *Davis*, 547 U.S. at 827, 126 S.Ct. at 2276, 165 L.Ed.2d at 240 (emphasis omitted). In *Hammon*, on the other hand, the Court held the statements testimonial and thus inadmissible, explaining that "[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal *past* conduct...." *Davis*, 547 U.S. at 829, 126 S.Ct. at 2278, 165 L.Ed.2d at 242 (emphasis added). Although the Court's opinion in *Davis* "clarified the definition of 'testimonial' statements," *United States v. Crockett*, 586 F.Supp.2d 877, 887 (E.D.Mich.2008), the Supreme Court did not "attempt[ ] to produce an exhaustive classification of all conceivable statements ... as either testimonial or nontestimonial...." *Davis*, 547 U.S. at 822, 126 S.Ct. at 2273, 165 L.Ed.2d at 237.

---

constru[ing] the context of the 'ongoing emergency' for purposes of its analysis." *Saracoglu v. Walker*, 2010 WL 1221764, at *9, 2010 U.S. Dist. LEXIS 27640, at *27 (C.D. Cal. 27 January 2010). As explained more fully *infra*, however, after *Bryant*, the "ongoing emergency" concept is no longer construed so narrowly. *See Bryant*, —— U.S. at ——, 131 S.Ct. at 1158, 179 L.Ed.2d at 110 (criticizing the Supreme Court of Michigan for "employ[ing] an unduly narrow understanding of 'ongoing emergency' that *Davis* does not require"); Posting of Prof. Richard D. Friedman to The Confrontation Blog, http://www.confrontationright.blogspot.com/2011/03/preliminary-thoughts-on bryantdecision.html (2 March 2011, 00:42 EST) (noting that the court, in *Bryant* "takes the 'primary purpose' language of *Davis* and expands on it").

Enter *Bryant,*[4] which sought to "further expla[i]n[ ] . . . the 'ongoing emergency' circumstance addressed in *Davis.*" *Bryant,* —— U.S. at ——, 131 S.Ct. at 1156, 179 L.Ed.2d at 108. In *Bryant,* Michigan police officers responded to a dispatch that a man had been shot in a gas station parking lot. *Bryant,* —— U.S. at ——, 131 S.Ct. at 1150, 179 L.Ed.2d at 102. Upon arrival, the officers found the victim lying on the ground suffering from a gunshot wound to his abdomen, "appear[ing] in great pain, and sp[ea]k[ing] with difficulty." *Id.* Further,

> [t]he police asked him what had happened, who had shot him, and where the shooting had occurred. [The victim] stated that "Rick" shot him at around 3 a.m. He also indicated that he had a conversation with Bryant, whom he recognized based on his voice, through the back door of

---

**4.** At the time the present case was argued before us, *Michigan v. Bryant,* —— U.S. ——, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), had not yet been decided. In the period between the Supreme Court's opinions in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and *Bryant,* two separate lines of cases developed in the state courts regarding the testimonial nature *vel non* of 9-1-1 calls made following the completion of a crime. *Compare, e.g., Commonwealth v. Simon,* 456 Mass. 280, 923 N.E.2d 58, 75 (2010) ("[T]he statements in the 911 telephone call in which the victim identified the nature of the emergency and described the shooter were not testimonial . . . .") *and Glover v. State,* 678 S.E.2d 476, 478-79 (2009) (holding that statements made in a 9-1-1 call were non-testimonial where "the calls were made while the incident was still ongoing, the perpetrator was at large, and the operator's questions were intended to assist the police in meeting an ongoing emergency") *with State v. Koslowski,* 166 Wash.2d 409, 209 P.3d 479, 488 (2009) (holding that "the . . . fact that the suspects were at large and that [the] Sergeant . . . relayed the information he learned from [the declarant] to officers in the field is not enough to show the questions . . . were necessary to resolve a present emergency situation") *and People v. Trevizo,* 181 P.3d 375, 379 (Colo.Ct.App.2007) (holding that statements made in a 9-1-1 call were testimonial where "there was no immediate threat to the victim, [and] defendant had left the scene"). Until *Bryant,* Langley could have hung his hat on the latter line of cases. With the filing of *Bryant,* however, the screws to that coat rack came loose. *See Philpot v. State,* 309 Ga.App. 196, 709 S.E.2d 831, 835 (2011) (noting that *Bryant* "substantially alters and expands the framework for analyzing whether an out-of-court statement being challenged on Confrontation Clause grounds is testimonial or nontestimonial in nature").

Bryant's house. [The victim] explained that when he turned to leave, he was shot through the door and then drove to the gas station, where police found him.

*Id.* (internal citations and quotation marks omitted). The victim later died of his injuries before trial. *Id.* At trial— occurring prior to *Crawford* and *Davis*—the police officers that spoke with the victim at the scene testified as to the victim's statements. *Id.* Ultimately, Bryant was convicted of second-degree murder and related charges. *Id.*

The Supreme Court of Michigan held that the statements were testimonial and—with the victim unavailable and there being no prior opportunity for cross-examination by Bryant— inadmissible, explaining that the circumstances "clearly indicate that the 'primary purpose' of the questioning was to establish the facts of an event that had *already* occurred; the 'primary purpose' was not to enable police assistance to meet an ongoing emergency." *Bryant*, —— U.S. at ——, 131 S.Ct. at 1151, 179 L.Ed.2d at 103 (quoting *People v. Bryant*, 483 Mich. 132, 768 N.W.2d 65, 71 (2009)). Rather, explained the state supreme court, the victim's "primary purpose in making these statements to the police . . . was . . . to tell the police who had committed the crime against him, where the crime had been committed, and where the police could find the criminal," noting that the officers' actions did not suggest that they perceived an ongoing emergency at the scene of the crime. *Bryant*, —— U.S. at ——, 131 S.Ct. at 1151, 179 L.Ed.2d at 103 (quoting *People v. Bryant*, 768 N.W.2d at 71). Because *Davis* "arose in the domestic violence context, that was the situation [the Court] had immediately in mind," the U.S. Supreme Court granted certiorari to

"confront for the first time circumstances in which the "ongoing emergency" discussed in *Davis* extends beyond an initial victim to a potential threat to the responding police and the public at large. This new context requires [the Court] to provide additional clarification with regard to what *Davis* meant by . . . 'an ongoing emergency.' "

*Bryant,* —— U.S. at ——, 131 S.Ct. at 1156, 179 L.Ed.2d at 108 (some quotation marks omitted).

■ The Court, through Justice Sotomayor, explained that "the existence of an 'ongoing emergency' at the time of an encounter between an individual and the police is among the most important circumstances informing the 'primary purpose' of an interrogation," because an emergency "focuses the participants on something other than proving past events potentially relevant to later criminal prosecution." *Bryant,* —— U.S. ——, 131 S.Ct. at 1157, 179 L.Ed.2d at 109 (some internal quotation marks and alterations omitted). The Court explained that, in *Davis,* it did not "define the outer bounds of 'ongoing emergency,'" and that whether an emergency exists is a "highly context-dependent inquiry." *Bryant,* —— U.S. at ——, 131 S.Ct. at 1158, 179 L.Ed.2d at 110. For instance, because *Davis* involved a domestic dispute, the Court "focused only on the threat to the victims and assessed the ongoing emergency from the perspective of whether there was a continuing threat to them." *Id.* (emphasis omitted). The Court continued:

> Domestic violence cases ... often have a narrower zone of potential victims than cases involving threats to public safety. An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue.

*Bryant,* —— U.S. at ——, 131 S.Ct. at 1158, 179 L.Ed.2d at 110; *see Bryant,* —— U.S. at ——, 131 S.Ct. at 1163, 179 L.Ed.2d at 116 ("[T]he scope of an emergency in terms of its threat to individuals other than the initial assailant and victim will often depend on the type of dispute involved."). Thus, except in domestic disputes with similar facts as those with which the Court in *Davis* dealt, a court may not hold that an emergency is no longer ongoing merely because the alleged assailant has fled the scene of the crime.

■ Related to the type of *crime* as a relevant factor in determining whether an emergency is "ongoing," explains the Court in *Bryant,* is "the type of *weapon* employed." *Bryant,* —— U.S. at ——, 131 S.Ct. at 1158, 179 L.Ed.2d at 111 (emphasis added); *see id.* (criticizing the Supreme Court of Michigan for "rel[ying] on *Davis* and *Hammon,* in which the assailants used their fists, as controlling the scope of the emergency [in *Bryant* ], which involved the use of a gun"). That is, in *Davis,* being a domestic dispute involving fists only, there was less concern that the assailant remained a threat to responding officers or the public at large after he left the scene of the crime. *See Commonwealth v. Beatrice,* 460 Mass. 255, 260, 951 N.E.2d 26 (2011) (holding as "testimonial" statements made in a 9–1–1 call where "there was no suggestion . . . that her boy friend was armed with a dangerous weapon, or that her boy friend posed any risk to the public at large"). The same, obviously, cannot be said of an unknown *shooter,* as in the present case.[5] *See Bryant,* —— U.S. at ——, 131 S.Ct. at 1158, 179 L.Ed.2d at 111 (quoting United States as *Amicus Curiae* in *Bryant,* at 20) ("An emergency posed by an unknown shooter who remains at large does not automatically abate just because the police can provide security to his first victim."); *Bryant,* —— U.S. at ——, 131 S.Ct. at 1164, 179 L.Ed.2d at 117 ("An emergency does not last only for the time between when the assailant pulls the trigger and the bullet hits the victim."); *see also Guevara v. Adams,* 2011 WL 1790605, at *5, 2011 U.S. Dist. LEXIS 49905, at *13 (C.D. Cal. 25 March 2011) (post-*Bryant* case holding statements from a non-victim caller to a 9–1–1 dispatcher to be non-testimonial, where the dispatcher's questions were "posed in response to a report of a violent event" (a stabbing), and that the "initial questions focused on ascertaining the location of the incident

---

**5.** That is, in a case where a shooting just occurred and the shooter is at large, because of the potential continuing threat to responding authorities and the public at large, the information relayed from the caller to the 9–1–1 dispatcher relates to a present event, and does not involve "possibly criminal *past* conduct. . . ." *Davis,* 547 U.S. at 829, 126 S.Ct. at 2278, 165 L.Ed.2d at 242 (emphasis added).

and the victim, and the identity of the assailant"); *Philpot v. State,* 309 Ga.App. 196, 709 S.E.2d 831, 839 (2011) (post-*Bryant* case holding that a victim's statements to a responding officer following a burglary were non-testimonial, where, "by the time the officer arrived, it could have reasonably been presumed ... that the burglar, who had just left the scene of the crime armed with a knife, was still in the immediate vicinity").

■ In the present case, an individual walked into the carry-out store and killed the store's owner with a gunshot to the head. The caller relayed to the 9–1–1 dispatcher that a *shooting* had *"just occurred."* (Emphasis added.)[6] After waiting for the 9–1–1 dispatcher to give the caller another number to call, the caller exclaims, "Hurry up. It just happening." The caller informs the dispatcher that he had "seen the guy" and that he knew the color and the tag number of the getaway vehicle, and approximately what the assailant was wearing. The facts of this case, then, are similar to those with which the Supreme Court in *Bryant* dealt, as both involve assailants inflicting wounds with a firearm, and the declarant relaying identifying information to law enforcement personnel.[7] After *Bryant,* it is of little matter that the purpose of the call was not to stop the immediate shooting or get medial assistance; all that matters for purposes of the "ongoing emergency" analysis is that the caller in the present case was reporting a shooting that was "just happening," and that the

---

**6.** The dissent's argument, which relies on *Davis* alone, that the 9–1–1 caller's statements were testimonial because they occurred after the shooting is unpersuasive. The declarant in *Bryant* made his statements to the police 25 minutes after he was shot as well as described prior events in the past tense. *Michigan v. Bryant,* —— U.S. ——, 131 S.Ct. 1143, 1166, 179 L.Ed.2d 93, 118–19 (2011).

**7.** The Supreme Court in *Davis* explained that 9–1–1 operators "may at least be agents of law enforcement when they conduct interrogations of 911 callers," and therefore "consider[ed] their acts to be acts of the police" for purposes of that opinion. *Davis,* 547 U.S. at 823 n. 2, 126 S.Ct. at 2274 n. 2, 165 L.Ed.2d at 238 n. 2. We do the same.

shooter was fleeing, thus remaining potentially a threat to responding authorities and the public at large.[8]

*Bryant* clarified, however, that its emphasis on the existence of an "ongoing emergency" "should not be taken to imply that the existence *vel non* of an ongoing emergency is dispositive of the testimonial inquiry." *Bryant*, —— U.S. at ——, 131 S.Ct. at 1160, 179 L.Ed.2d at 112. Another factor, the Court explained, "is the importance of *informality* in an encounter between a victim and police." *Id.* In explaining that this "prong" weighed in favor of a finding that the statements were non-testimonial, the Court explained that "[t]his situation is more similar . . . to the informal, harried 911 call in Davis than to the structured, station-house interview in *Crawford.*" *Bryant*, —— U.S. at ——, 131 S.Ct. at 1166, 179 L.Ed.2d at 119. We consider the 9–1–1 call in the present case to be "harried,"[9] with the caller telling the dispatcher to "[h]urry up," and saying "[h]ello?" when apparently the dispatcher remained silent for a period of time. That is, we believe that a review of "the statements and actions of both the declarant and [dispatcher] provide objective evidence," *Bryant*, —— U.S.

---

**8.** We foresee an argument that the 9–1–1 call in the present case is not associated with a call seeking police assistance, as the only information the caller relates concerns the identification of the alleged shooter—i.e., his car tag number and his physical appearance. Perhaps such identifying information is not associated with a call seeking police assistance *to help the shot victim,* but it is certainly information that is associated with a call seeking police assistance *to help capture the fleeing suspect* who remains a potential threat to responding authorities and the public at large. After *Bryant,* the "ongoing emergency" analysis focuses on the latter, not the former.

**9.** Even assuming the 9–1–1 caller was not "frantic" (or "harried" as *Bryant* describes), as the dissent argues, the trial court determined that the statements were at least excited utterances, and therefore justifiably reliable. *See Michigan v. Bryant,* —— U.S. ——, 131 S.Ct. 1143, 1157, 179 L.Ed.2d 93, 109 (2011) ("[T]he prospect of fabrication in statements given for the primary purpose of resolving [an] emergency is presumably significantly diminished [because] the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination. This logic is not unlike that justifying the excited utterance exception in hearsay law.").

at ——, 131 S.Ct. at 1160, 179 L.Ed.2d at 112, that the caller's statements in the present case are non-testimonial.

Our recent, *pre-Bryant*, opinion in *State v. Lucas*, 407 Md. 307, 965 A.2d 75 (2009), is not to the contrary. In *Lucas*, Anne Arundel County police officers responded to a "[d]omestic call." *Lucas*, 407 Md. at 309, 965 A.2d at 77. Upon arriving at the residence, the officers interviewed the victim at length. *See Lucas*, 407 Md. at 309–10, 965 A.2d at 77. At trial, one of the officers agreed that his "purpose in speaking with [the victim] or knocking on the door and speaking with the occupants was to conduct an investigation" and that he was "there to gather information." *Lucas*, 407 Md. at 310, 965 A.2d at 77. We held that the statements, in which the victim gave details about the domestic dispute and identified her attacker, were testimonial, considering they indicated a "primary purpose to 'establish or prove past events potentially relevant to later criminal prosecution' and not to 'enable police assistance to meet an ongoing emergency.'" *Lucas*, 407 Md. at 323–24, 965 A.2d at 85 (quoting *Davis*, 547 U.S. at 822, 126 S.Ct. at 2273, 2274, 165 L.Ed.2d at 237).

The facts in *Lucas* are distinguishable readily from the facts in the present case and from those with which the Supreme Court dealt in *Bryant*. Unlike the present case and *Bryant*, *Lucas* involved a domestic dispute between the victim and her male friend. *See Lucas*, 407 Md. at 309, 965 A.2d at 77. Further, the weapon employed in *Lucas* was the assailant's fists and feet, not a firearm, as in the present case and in *Bryant*. *See id.* Considering the type of crime and the nature of the weapon employed, we were correct in *Lucas* to hold that there was no "ongoing emergency," and, thus, that the statements to the police officers were testimonial. Importantly, in *Lucas*, we said that the circumstances in that case "are distinct from those in which officers encountered *victims with apparent severe injuries requiring immediate medical attention and/or where an assailant had not yet been located.*" *Lucas*, 407 Md. at 324, 965 A.2d at 86 (emphasis added). Of course, in the present case, the caller was reporting a shooting (which suggests potentially "apparent severe injuries requir-

ing immediate medical attention") and the assailant had not yet been located. Accordingly, any reliance on *Lucas* is misplaced.

Like *Bryant*, in the present case, "at no point during the questioning did either [the caller] or the police [dispatcher] know the location of the shooter." [10] *Bryant*, —— U.S. at ——, 131 S.Ct. at 1164, 179 L.Ed.2d at 117. Further, like *Bryant*, "[n]othing [the caller] said to the police [dispatcher] indicated that the cause of the shooting was a purely private dispute or that the threat from the shooter had ended." *Bryant*, —— U.S. at ——, 131 S.Ct. at 1163, 179 L.Ed.2d at 116. Nor should this Court review a purported ongoing emergency with the benefit of hindsight; statements must be reviewed objectively—at the time they were made—as to whether a reasonable person would believe there was an emergency, "even if that belief is later proved incorrect." *Bryant*, —— U.S. at —— n. 8, 131 S.Ct. at 1157 n. 8, 179 L.Ed.2d at 109 n. 8. Accordingly, we classify the caller's statements to the 9-1-1 dispatcher in the present case as "the exact type of questions necessary to allow the police to ' "assess the situation, the threat to their own safety, and possible danger to the potential victim" ' and to the public," *Bryant*, —— U.S. at ——, 131 S.Ct. at 1166, 179 L.Ed.2d at 118 (quoting *Davis*, 547 U.S. at 832, 126 S.Ct. at 2279, 165 L.Ed.2d at 243 (quoting *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt County*, 542 U.S. 177, 186, 124 S.Ct. 2451, 2458, 159 L.Ed.2d 292, 303 (2004))), and hold that the statements do not implicate the Confrontation Clause and, thus, are admissible.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.**

BELL, C.J., GREENE, and ELDRIDGE, JJ., Dissent.

---

**10.** We recognize, like the Supreme Court, that "none of this suggests that an emergency is ongoing in every place or even just surrounding the victim for the entire time that the perpetrator of a violent crime is on the loose." *Bryant*, —— U.S. at ——, 131 S.Ct. at 1159, 179 L.Ed.2d at 111.

ELDRIDGE, J., dissenting, in which BELL, C.J., and GREENE, J., join.

I dissent. The United States Supreme Court, in overturning *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and establishing new guidelines for the admission of out-of-court statements, set forth in its opinions several criteria to be used to determine whether the primary purpose of those statements is testimonial or not. The majority opinion ignores most of these criteria and focuses almost exclusively on the single issue of whether the telephone call was made during an ongoing emergency. Because the shooter in this case had left the scene of the crime, and no longer posed an immediate threat to individuals in the vicinity or to police, there was not an ongoing emergency at the time the 911 call was made. Moreover, even if there was an ongoing emergency, the majority opinion fails to properly apply all of the criteria explained in the Supreme Court's evolving line of cases regarding testimonial statements. A correct analysis of all the criteria shows that the caller's statements in this case were clearly testimonial and should not have been admitted into evidence without allowing the defense to cross-examine the caller.

## I.

The main issue of contention in this case arose when the State sought to introduce into evidence a recorded 911 call that had been the subject of a pre-trial motion in limine by defense counsel. Defense counsel argued that admitting the 911 recording violated the Confrontation Clauses of the Sixth Amendment and Article 21 of the Maryland Declaration of Rights because the caller was not present at the trial. As the caller's identity was unknown, defense counsel contended that the tape of the 911 call "places [the defense] in an awkward position simply because [the caller] is not subject to any cross-examination." The State countered defense arguments by pointing out that

"[T]he Confrontation Clause says that the defense should have an opportunity ... to cross-examine those who bear witness against them.... [T]he purpose of making a 911 call is not to bear witness, but to provide information ... through the excited utterance exception to the hearsay rule...."

Over defense counsel objections, the 911 tape was held to be admissible. The trial judge decided that admitting the 911 recording did not trigger the protections of the Confrontation Clause because the call

"was simply an ordinary citizen giving information as to the suspect or suspects, or possible suspects, during a startling event and ... I find that the information was non-testimonial hearsay."

The information on the tape was used to link the license plate number of the getaway car to a vehicle driven by the defendant on the day of the shooting.

Langley was convicted of murder in the first degree, use of a handgun in the commission of a felony, and wearing or carrying a handgun. He appealed to the Court of Special Appeals, arguing, *inter alia,* that his Sixth Amendment and Article 21 rights of confrontation had been violated by the admission of the recorded 911 call. The Court of Special Appeals, in an unreported opinion, affirmed, holding that the 911 recording was non-testimonial and was not subject to the restrictions of the Confrontation Clauses. Citing the United States Supreme Court's decisions in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the intermediate appellate court decided that the statements made on the 911 recording were not " 'designed primarily to establish or prove some past fact,' " but, instead, that the call had been made " 'to resolve the present emergency' by catching the fleeing felon." Alternatively, the Court of Special Appeals held that, "if, *arguendo,* the admission of the 911 tape were in error," the "error was harmless." The appellate court vacated the defendant's conviction for wearing or carrying a

handgun, holding that it merged into the greater handgun offense.

Langley filed in this Court a petition for a writ of certiorari which was granted. In his petition, Langley did not contest the ruling by the trial court and the Court of Special Appeals that the caller's statements in the 911 call constituted an "excited utterance" and are therefore admissible under Maryland Rule 5–803(b)(2).[1] Rather, Langley limited his question before this Court to whether the admission of the 911 call violated the Confrontation Clauses of the State and Federal Constitutions. He also challenged the Court of Special Appeals' ruling on harmless error.

## II.

The Sixth Amendment to the United States Constitution, applicable to state proceedings by virtue of the Fourteenth Amendment, guarantees that, "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him. . . ." Similarly, Article 21 of the Maryland Declaration of Rights mandates "[t]hat in all criminal prosecutions, every man hath a right to . . . be confronted with the witnesses against him; [and] . . . to examine the witnesses for and against him on oath. . . ." Langley contended that the admission of the recorded 911 call, without subjecting the caller to cross-examination, violated his rights to confront a witness.

As briefly explained in the majority opinion, the United States Supreme Court considered the permissibility of "[t]estimonial statements of witnesses absent from trial" in *Crawford*

---

1. Maryland Rule 5–803(b)(2) states that:
   "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
   
           ✸       ✸       ✸
   
   (b) Other exceptions.
   
           ✸       ✸       ✸
   
   (2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

*v. Washington, supra,* 541 U.S. at 59, 124 S.Ct. at 1369, 158 L.Ed.2d at 197. The Supreme Court traced the right to confront one's accusers back to Roman times and examined how that right had been shaped by English common law and practices in the early American Colonies. This historical review led to the following conclusion (541 U.S. at 59, 124 S.Ct. at 1369, 158 L.Ed.2d at 197):

> "Our cases have ... remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."

The *Crawford* Court, however, distinguished between "testimonial" statements, which are subject to the requirements of the Confrontation Clause, and "nontestimonial" statements, which may be admitted into evidence if they fall within one of the hearsay exceptions. The Court later explained that "the testimonial character of the statement ... separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington, supra,* 547 U.S. at 821, 126 S.Ct. at 2273, 165 L.Ed.2d at 237.

The Court declined to define comprehensively "testimonial" statements, but explained that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford,* 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192. The Court offered a representative list of statements that exemplified the "testimonial" class, stating (541 U.S. at 50–51, 124 S.Ct. at 1364, 158 L.Ed.2d at 193, internal quotation marks omitted):

> "Various formulations of this core class of testimonial statements exist: *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, ... [as well as] extrajudicial statements ... contained

in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions ... [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.... These formulations all share a common nucleus and then define the [Confrontation] Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing."

The Court in *Crawford* reviewed a recording of police officials interrogating a defendant's wife. The wife did not testify at her husband's trial due to the marital privilege, so the prosecution sought to introduce the tape of her interrogation instead. The Court held that the recording constituted a "testimonial" statement and, therefore, could not be admitted into evidence without subjecting the wife to cross-examination. As this Court observed in *State v. Snowden*, 385 Md. 64, 78, 867 A.2d 314, 322 (2005), the *Crawford* opinion "fundamentally altered ... Confrontation Clause jurisprudence." The *Crawford* opinion commenced the Supreme Court's foray into distinguishing between testimonial and non-testimonial statements, but the case left many questions unanswered regarding the criteria used to determine if a statement is "testimonial."

The Supreme Court next addressed this distinction in *Davis v. Washington, supra,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224. The Supreme Court in *Davis* reviewed two trials where witnesses' out-of-court statements were admitted. One of those trials involved a recorded 911 call, and the Court considered whether the statements contained in the 911 recording qualified as nontestimonial statements that could be admitted without subjecting the caller to defense questioning. The Supreme Court examined the content of the call to determine its admissibility. The 911 call in *Davis* commenced with a woman telling the operator that she is being attacked by her boyfriend and that " '[h]e's here jumpin' on me again' " and " 'usin' his fists.' " After giving the 911 operator her attacker's name and answering a few questions, the caller

stated that " '[h]e's runnin' now' " and explained that her attacker had " 'just r[un] out the door' " and was leaving in a car with someone else. The police arrived "within four minutes of the 911 call" and noted the " 'fresh injuries on her forearm and her face' " and her " 'frantic efforts' " to leave the residence. *Davis v. Washington, supra,* 547 U.S. at 817–818, 126 S.Ct. at 2271, 165 L.Ed.2d at 234–235.

The Supreme Court in *Davis* held that the statements contained in the 911 recording were "nontestimonial" and therefore properly admitted as evidence, explaining (547 U.S. at 822, 126 S.Ct. at 2273–2274, 165 L.Ed.2d at 237):

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

The Court acknowledged that the "inquiries of a police operator in the course of a 911 call are an interrogation in one sense," but clarified that the interrogation aspect of the inquiries alone was not enough to mandate that all 911 recordings are testimonial. *Davis,* 547 U.S. at 823, 126 S.Ct. at 2274, 165 L.Ed.2d at 238. The Court distinguished 911 calls from other sorts of interrogation because 911 calls are "ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Davis,* 547 U.S. at 827, 126 S.Ct. at 2276, 165 L.Ed.2d at 240.

To demonstrate the difference between testimonial and nontestimonial statements, the *Davis* opinion contrasted the police interrogation recording at issue in *Crawford* with the 911 call in *Davis,* explaining which aspects made the *Crawford* recording testimonial and the *Davis* 911 call nontestimonial. The Court stated that, in *Davis,* the caller was "speaking

about events *as they were actually happening,* rather than 'describ[ing] past events.'" *Davis,* 547 U.S. at 827, 126 S.Ct. at 2276, 165 L.Ed.2d at 240 (emphasis in original). The testimonial statements in *Crawford* took place "hours after" the criminal incident as compared to the 911 call, which dealt with an "ongoing emergency." The Court pointed out that the 911 call in *Davis* was "a call for help against a bona fide physical threat" rather than a "narrative report of a crime absent any imminent danger." *Ibid.* Moreover, the 911 operator's questions sought "to *resolve* the present emergency, rather than to learn (as in *Crawford* ) what had happened in the past." *Ibid.* Finally, the Court compared the "level of formality" between the two recordings, noting that the wife in *Crawford* calmly answered the police questions, while the 911 caller in *Davis* gave "frantic answers" from a setting that was "not tranquil, or even (as far as any reasonable 911 operator could make out) safe." 547 U.S. at 827, 126 S.Ct. at 2277, 165 L.Ed.2d at 240. As indicated in *Davis,* and as later summarized by this Court in *State v. Lucas,* 407 Md. 307, 323, 965 A.2d 75, 85 (2009), formality may also include details such as the interview's location, the declarant's spatial distance from the defendant, the police official's use of the declarant's replies, and whether the statements are deliberately recounted in response to interrogation. The Supreme Court captured the essence of these guidelines by noting: "No 'witness' goes into court to proclaim an emergency and seek help." 547 U.S. at 828, 126 S.Ct. at 2277, 165 L.Ed.2d at 241.

The *Davis* Court highlighted four factors in determining whether a statement is testimonial or nontestimonial. First, the timing of the statement in relation to the incident is important. Nontestimonial statements are made while events are actually happening, while testimonial statements occur after the incident. Nontestimonial statements relate to an ongoing emergency and are not a simple reporting of past incidents. Additionally, a nontestimonial statement seeks help to resolve a present crisis while a testimonial statement recounts or explains a past event or gives details regarding a crime that has occurred. The formality of the statement is also a factor in determining whether a statement is testimonial

or not. A nontestimonial statement is often made in a frantic state lacking tranquility, while calm answers are more a hallmark of testimonial statements. Despite describing these criteria in great detail, the *Davis* Court asserted that it was not "attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or non-testimonial." *Davis, supra,* 547 U.S. at 822, 126 S.Ct. at 2273, 165 L.Ed.2d at 237.[2]

The Supreme Court, in *Michigan v. Bryant,* 562 U.S. ——, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), recently clarified some of the criteria discussed in the *Davis* case. *Bryant* involved statements made by a fatally wounded gunshot victim in response to police questioning that occurred when the police first arrived at the scene of the crime. The Court held that the statements were nontestimonial. The Supreme Court in *Bryant* cautioned that courts should be careful not to construe *Davis* as having "decided more than it did" and thus should be wary of "employ[ing] an unduly narrow understanding of 'ongoing emergency' that *Davis* does not require." *Bryant,* 562 U.S. ——, 131 S.Ct. at 1158, 179 L.Ed.2d at 110. The *Bryant* Court observed that, "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Ibid.* Furthermore, a court's inquiry should be objective. The *Bryant* opinion explained that (562 U.S. ——, 131 S.Ct. at 1156, 179 L.Ed.2d at 109)

"the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred."

The *Bryant* Court repeated the holding of *Davis* that "the ultimate inquiry is whether the 'primary purpose of the inter-

---

2. For a comprehensive review of the *Crawford* and *Davis* decisions, see Judge Adkins's opinion for this Court in *State v. Lucas,* 407 Md. 307, 965 A.2d 75 (2009).

rogation [was] to enable police assistance to meet [the] ongoing emergency.'" *Bryant,* 562 U.S. ——, 131 S.Ct. at 1165, 179 L.Ed.2d at 117, quoting *Davis, supra,* 547 U.S. at 822, 126 S.Ct. at 2266, 165 L.Ed.2d at 224.[3]

The principal question before this Court is not, as the majority opinion portrays it, whether the statements made in the 911 call occurred during an ongoing emergency. If that were the test, recordings of all 911 calls would be admissible, as 911 is for emergencies only. Rather, the question is whether those statements are testimonial or not. Applying the factors utilized by the Supreme Court, I believe that the recording in the present case consisted of testimonial statements and, as such, should not have been admitted without making the caller available for questioning by the defense.

This Court should first examine the amount of time between the reported incident and the recorded statements. The timing of the 911 call in the present case strongly suggests that the statements are testimonial. Although the record does not show the amount of time lapsed between the 911 call and the shooting, the caller begins by telling the 911 operator that she wants "to give some information on a shooting that just occurred." In short, the caller is giving information about a past event. The caller urges the operator to "[h]urry up" because the incident is "just happening." The caller's urgency, however, does not relate to stopping the shooting or

---

**3.** Reading the majority opinion could lead one to believe that the Court, in *Bryant,* moved away from the "primary purpose" test. The majority states that "[a]fter *Bryant,* it is of little matter that the purpose of the call was not to stop the immediate shooting or get medical assistance...." The majority opinion overlooks the simple fact that, as the name of the test suggests, the purpose of the 911 call is the *primary* concern and "ultimate inquiry" of courts in determining whether the statements are testimonial or not. *Bryant,* 562 U.S. ——, 131 S.Ct. at 1160, 179 L.Ed.2d at 112 ("whether an ongoing emergency exists is simply one factor"). The *Bryant* Court explicitly followed the "primary purpose" test and explained that its opinion sought only to "provide additional clarification with regard to what *Davis* meant by 'the primary purpose ...'" test. *Bryant,* 562 U.S. ——, 131 S.Ct. at 1156, 179 L.Ed.2d at 108, quoting *Davis, supra,* 547 U.S. at 822, 126 S.Ct. at 2266, 165 L.Ed.2d at 224.

getting medical assistance, but instead relates to the fact that the caller has seen the apparent shooter get into his car and objectively believes that the perpetrator may successfully escape. The timing in *Davis* contrasts sharply with the present case. In *Davis*, the caller tells the operator that she is being beaten, her attacker is still in the home, and only after ten responses does she report that her attacker is leaving. It is clear that the caller in the case at bar is not describing the shooting as it is actually happening, and she is not facing the same immediacy of events faced by the speakers in *Davis* and *Bryant*. The caller was describing past events.

The existence of an "ongoing emergency" is closely related to the timing of the statements. The Supreme Court in *Bryant* explained that "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Bryant*, 562 U.S. ——, 131 S.Ct. at 1158, 179 L.Ed.2d at 110. In *Bryant*, the statements were made by the victim while the victim was suffering from a gunshot wound. In *Davis*, the attacker was still in the home with the caller when she dialed 911 and reported that he was beating her. In the present case, the caller, notably not a victim of the shooting, called after the attack had occurred and reported that she had seen the apparent shooter get into a car. The alleged perpetrator had already fled the scene of the shooting, the police were on their way, and the caller contacted 911 only to report information about the flight of the apparent shooter. At the time of her 911 call, the emergency was not ongoing; it had concluded.

The majority opinion, dramatically and without reason, expands the holding of *Bryant* to conclude that "except in domestic disputes" with facts similar to *Davis*, "a court may not hold that an emergency is no longer ongoing" because the alleged perpetrator has fled. No such language is found in *Bryant*. The *Bryant* opinion does not limit the holding of *Davis* to domestic disputes and, in fact, declares that an emergency is *not* ongoing when, as in the present case, a perpetrator "flees with little prospect of posing a threat to the public." *Bryant*, 562 U.S. ——, 131 S.Ct. at 1159, 179 L.Ed.2d

at 112. Although the majority opinion attempts to portray the facts in this case as similar to *Bryant*, where the police did not know if the shooter remained in the area or continue to pose a threat, the police in this case knew that the shooter had left the scene and was no longer a threat to the police or the public at the scene.

Moreover, the majority opinion argues on the one hand that there is an ongoing emergency any time a shooter is at large, but, on the other hand, concedes in footnote 8 that an emergency is not ongoing simply because a suspect has not yet been caught. According to the majority's reasoning, a witness could see a suspect the following day, call 911 "seeking police assistance to help capture the fleeing suspect," and such a call would qualify as an "ongoing emergency."

Another element of a nontestimonial statement is that such statements seek help to resolve a present crisis. The caller in the present case did not call 911 to request police or any other assistance. The caller did not tell the operator any information concerning the shooting, such as the specific shop in which the shooting took place, how many people, if any, were shot, if there were any injuries, or what instigated the shooting. The only information the caller relates concerns the identification of the alleged shooter—his car tag number and his physical appearance. All of this information is typically testimonial and is not associated with a call seeking police assistance. A starkly different situation was presented in *Bryant* where the police encountered a wounded victim in a parking lot and asked him " 'what had happened, who had shot him, and where the shooting occured.' " *Bryant*, 562 U.S. ——, 131 S.Ct. at 1166, 179 L.Ed.2d at 118. Not only were these questions not asked by the 911 operator in the present case, but the information relayed by the caller barely touches on these topics and certainly does not hold the same importance in resolving an ongoing emergency. The majority opinion asserts that, in the present case, the caller said nothing to indicate that the " 'threat from the shooter had ended.' " I find it impossible to assume anything less from the caller's statements that she had seen the shooter get into a car and flee the

scene. The operator did not even ask if medical assistance was required and merely asked questions later used to identify the shooter.

When asked by the operator where the police should be sent, the caller replies that police are not needed and redirects the questioning by telling the operator that she is calling to report details of the getaway vehicle, stating:

> "I don't want [the police] sent nowhere. They already going out to the store. But the guy, I seen him get in the car. Tag number MRG 908."

A hallmark of a testimonial statement is the declarant's desire to give details regarding a crime that has occurred in the past. Where statements are " 'neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation'... they [are] testimonial." *Bryant,* 562 U.S. ——, 131 S.Ct. at 1155, 179 L.Ed.2d at 107. The caller in the present case continued to give a detailed description of the car that the apparent shooter left in, repeating three times the tag number she had noticed. The purpose of her 911 call was emphasized throughout the recording; she was calling to give information to assist the police in apprehending the suspect, not to request assistance.

The formality and tone of the call may denote whether the caller's intent is testimonial or not. The Supreme Court noted that the answers to the questions posed in *Crawford* were calmly given, but the tenor of the 911 call in *Davis* was "frantic," and the caller was in an environment that was "not tranquil" and not even safe. In *Bryant,* nontestimonial statements were made by a victim suffering a mortal injury "in an exposed, public area, before emergency medical services arrived, and in a disorganized fashion." *Bryant,* 562 U.S. ——, 131 S.Ct. at 1148, 179 L.Ed.2d at 100. While the transcript in the present case does not reveal the location of the caller, there is no evidence that she was present in the Carry–Out store at the time of the shooting or ever in an unsafe environment.

Naturally, there is an excited tone to the 911 call in the case at bar, but objectively that excited tone is not as "frantic" as a

woman calling 911 to request help because she is being attacked or a wounded victim telling police who shot him while waiting for medical assistance in a parking lot. The Court of Special Appeals attributed the caller's anxiety to the hope that the police would be able to catch a fleeing felon, and this is an appropriate assumption. The caller was not a victim of the shooting, did not request police assistance, and there are no objective indications that she was ever in danger.

Finally, the Supreme Court stated in *Bryant* (562 U.S. ——, 131 S.Ct. at 1159, 179 L.Ed.2d at 111):

"The medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one."

The nontestimonial statements in both *Davis* and *Bryant* were made by victims of an ongoing crime, while the statements in this case were made by a spectator, seemingly uninvolved with the crime except for her description of the vehicle used by the apparent shooter to leave the scene. This is not to say that only victims may make nontestimonial statements, but a review of those cases where 911 calls have been determined to be nontestimonial shows that many of them are calls made by the victims themselves, or at least individuals in some way seriously involved in the criminal incident. *See, e.g., United States v. Arnold*, 486 F.3d 177 (6th Cir.2007); *Smith v. United States*, 947 A.2d 1131 (D.C.2008); *Commonwealth v. Galicia*, 447 Mass. 737, 857 N.E.2d 463 (2006); *State v. Kemp*, 212 S.W.3d 135 (Mo.2007); *State v. Camarena*, 344 Or. 28, 176 P.3d 380 (2008).

Recently, this Court employed criteria similar to the *Davis* factors in determining whether statements made to the police were testimonial or not. In *State v. Lucas, supra*, 407 Md. 307, 965 A.2d 75, the Court considered statements made by a domestic violence victim when police officers encountered her at the entrance to her apartment. The Court determined that the "emergency had ended" by the time the police met the

victim at the door of her apartment and that "[a] reasonable listener would recognize that the [victim's] emergency had ceased." 407 Md. at 324, 965 A.2d at 85–86. The Court also took into consideration the fact that the victim "spoke of past events" and she was "no longer under any apparent imminent danger when she spoke" to the police. 407 Md. at 324, 965 A.2d at 85–86. As such, the victim's responses to the police officers were testimonial and could not be admitted without making her available for cross-examination. Despite the fact that the victim was "visibly upset and exhibited injuries," this Court noted that the police officers did not call for emergency medical assistance. The Court concluded that the "circumstances of [the police officer's] interrogation objectively indicate a primary purpose to 'establish or prove past events potentially relevant to later criminal prosecution' and not to 'enable police assistance to meet an ongoing emergency.'" *State v. Lucas*, 407 Md. at 325, 323–324, 965 A.2d at 86, 85. The same is true in the present case.

When the criteria applied in *Davis, Bryant*, and *Lucas* are applied to the case at bar, it is clear that the 911 recording played to the jury at Langley's trial was testimonial. Unlike the 911 call the Supreme Court deemed nontestimonial in *Davis*, where the "primary purpose was to enable police assistance to meet an ongoing emergency," the 911 recording in the instant case served only to provide a "'weaker substitute for live testimony' at trial." 547 U.S. at 828, 126 S.Ct. at 2277, 165 L.Ed.2d at 240–241. The State in this case virtually admitted as much, stating in pre-trial argument, against the defense's motion in limine, as follows:

"The only reason the State would want to use it is to get in the license place number that someone who witnesses the shooting calls and gives to the Police as the event is taking place, as the Defendant is getting in his car and as he is leaving."

The call was not eliciting help, but rather was used by the State in place of live testimony.

Moreover, the 911 caller's statements in the present case were intended to be a "'solemn declaration or affirmation

made for the purpose of establishing or proving some fact' " rather than a call for immediate assistance to the scene of a crime. *Crawford,* 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192 (internal quotation marks omitted). The caller herself evinced the knowledge that her statements would be used as an affirmation of fact in subsequent investigations, telling the operator, when she was unsure of her answer, "don't quote me ..." on certain parts of her identification information. Objectively viewed, the primary purpose of the exchange between the caller and the 911 operator in the present case was not to enable police assistance in the midst of an ongoing emergency. The caller was simply a witness calling after the crime occurred to provide information for use in the shooter's apprehension and eventual trial. Her statements were therefore testimonial.

This Court should reverse the judgment of the Court of Special Appeals and direct that court to remand the case for a new trial.

Chief Judge BELL and Judge GREENE join in this dissent.